# No. 24-1152

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# TENTH CIRCUIT

OPEN INTERNATIONAL, LLC AND OPEN INVESTMENTS, LLC,

*Defendants-Appellants,*

v.

CITY OF FORT COLLINS,

*Plaintiff-Appellee.*

Appeal from the United States District Court for the Dist. of Colorado
No. 1:21-cv-02063 - District Judge Charlotte N. Sweeney

### DEFENDANTS-APPELLANTS' OPENING BRIEF
### ORAL ARGUMENT REQUESTED

**Laurie Webb Daniel**
Webb Daniel Friedlander LLP
75 14th Street NE
Suite 2450
Atlanta, Georgia 30309
(404) 433-6430
Laurie.daniel@webbdaniel.law

**Jeffrey Keith Sandman**
Webb Daniel Friedlander LLP
5208 Magazine Street
Suite 364
New Orleans, Louisiana 70115
(978) 886-0639
Jeff.sandman@webbdaniel.law

*Attorneys for Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 10 Cir. R. 28.2(C)(6), Appellants Open International, LLC and Open Investments, LLC make the following disclosures.

Open International, LLC is a Florida limited liability company with its principal place of business in Florida. Its members are Open Investments, LLC (which owns 80%) and Theia Technologies, LLC ("Theia") (which owns 20%). Theia is 100% owned by Hernando Parrott, a Florida resident.

Open Investments, LLC is a Florida limited liability company with its principal place of business in Florida. Its sole member is the Corredor Security Trust. The Corredor Security Trust is a registered in Florida and its sole beneficiary is William Corredor, a Florida resident.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... I

TABLE OF AUTHORITIES .................................................................V

STATEMENT OF PRIOR OR RELATED APPEALS........................................VIII

GLOSSARY.................................................................... IX

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................2

STATEMENT OF THE CASE.................................................................3

    *NATURE OF THE CASE*................................................................3

    *STATEMENT OF FACTS* ...............................................................4

    *COURSE OF PROCEEDINGS AND DISPOSITION BELOW* ...............................13

    *STANDARDS OF REVIEW* .........................................................19

SUMMARY OF ARGUMENT .............................................................20

ARGUMENT .............................................................................23

I.      The City has no actionable claim for fraudulent inducement. ............23

    A.    The merger clause/economic loss rule limits the City to a contractual remedy. ............................................................23

    B.    The City affirmed the contract through multiple amendments after the problems were known, thereby forfeiting its right to the equitable remedy of rescission. ......................................31

    C.    There was no material misrepresentation..............................38

II.       Open Investments, cannot be liable for the rescission damages. ........41

   A.     Open Investments cannot be liable because it made no

        misrepresentations. .................................................................42

   B.     Open Investments owes no restitution. ...............................45

CONCLUSION .................................................................................47

STATEMENT CONCERNING ORAL ARGUMENT ..........................................48

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT AND

TYPEFACE AND TYPE-STYLE REQUIREMENTS ..........................................49

CERTIFICATE OF DIGITAL SUBMISSION AND

PRIVACY REDACTIONS .......................................................................50

CERTIFICATION OF SUBMISSION OF HARD COPIES OF PLEADING .......50

CERTIFICATE OF SERVICE .................................................................51

ATTACHMENTS

ECF 309:    Oral rulings on Defendants' motion for judgment as a

           matter of law under Fed. R. Civ. P. 50(a)…………...………….Att. 1


ECF 328:    Order on Defendants' Motion for Judgment under

           Fed. R. Civ. P. 52(c) (3/21/2024)………………………………...Att. 7


ECF 329:    Final Judgment (3/26/2024)……………………………………Att. 30


ECF 332:    Amended Final Judgment (3/28/2024)…………………………Att. 32

ECF 367:     Minute Entry for Hearing on Aug. 15, 2024, memorializing
             Denial of Defendants' Rule 50(b) Renewed Motion for
             judgment as a matter of law and denying Defendants'
             post-trial motions pursuant to Fed. R. Civ. P. 50(b), 52(b),
             59(e), and 59(a) (8/15/2024)……………………………………Att. 34

ECF 372:     Oral Rulings on Defendants' Rule 50(b) Renewed Motion for
(to be       judgment as a matter of law and denying Defendants'
filed)       post-trial motions pursuant to Fed. R. Civ. P. 50(b), 52(b),
             59(e), and 59(a) (8/15/2024)……………………………………Att. 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bermel v. Blueradios, Inc.*,
2019 CO 31, 440 P.3d 1150 (Colo. 2019) ...........................................28

*BRW, Inc. v. Dufficy & Sons, Inc.*,
99 P.3d 66 (Colo. 2004)................................................... 24, 25, 30

*Colo. Coffee Bean, LLC v. Peaberry Coffy, Inc.*,
251 P.3d 9 (Colo. App. 2010) ...............................................23

*ConcealFab Corp. v. Sabre Indus., Inc.*,
2017 WL 6297672 (D. Colo. Dec. 11, 2017) ....................................41

*Dream Finders Homes LLC v. Weyerhaeuser NR Co.*,
2021 COA 143, 506 P.3d 108 (Colo. App. 2021) ................................ 27, 28, 29

*Eitel v. Alford*,
127 Colo. 341, 257 P.2d 955 (Colo. 1953) .......................................35

*Elk River Assocs. v. Huskin*,
691 P.2d 1148 (Colo. App. 1984)................................................. 35, 36

*Elm Ridge Expl. Co., LLC v. Engle*,
721 F.3d 1199 (10th Cir. 2013) ...........................................19

*Former TCHR, LLC v. First Hand Mgmt. LLC*,
2012 COA 129, 317 P.3d 1226 (Colo. App. 2012) ...........................................29

*Gerbaz v. Hulsey*,
132 Colo. 359, 288 P.2d 357 (Colo. 1955) .......................................34

*Gladden v. Guyer*,
162 Colo. 451, 426 P.2d 953 (Colo. 1967) ...................................... 34, 35, 36, 37

*Halm v. Wright*,
63 Colo. 419, 168 P. 36 (Colo. 1917) ......................................... 35, 36

v

*Hamon Contractors, Inc. v. Carter & Burgess, Inc.*,
    229 P.3d 282 (Colo. App. 2009) ...........................................29

*Hayes v. SkyWest Airlines, Inc.,*
    12 F.4th 1186 (10th Cir. 2021) ...........................................19

*Holscher v. Ferry*,
    131 Colo. 190, 280 P.2d 655 (Colo. 1955) ...........................................37

*In re Mascio*,
    454 B.R. 146 (D. Colo. 2011) ...................................... 35, 36

*LBI Group, LLC v. Scanlan*,
    No. 23CA1265, 2024 WL 3947026 (Colo. App. July 11, 2024) ........................23

*McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC*,
    2021 COA 2, 486 P.3d 439 (Colo. App. 2021) ...................................28

*Mountain Dudes v. Split Rock Holdings, Inc.*,
    946 F.3d 1122 (10th Cir. 2019) ...........................................19

*Myers v. Alliance for Affordable Servs.*,
    371 Fed. Appx. 950 (10th Cir. 2010) .................................................40

*Palace Expl. Co. v. Petroleum Dev. Co.*,
    316 F.3d 1110 (10th Cir. 2003) .........................................45

*Perez v. El Tequila, LLC*,
    847 F.3d 1247 (10th Cir. 2017) .........................................43

*RE/MAX, LLC v. Quicken Loans Inc.*,
    295 F. Supp.3d 1163 (D. Colo. 2018).................................................30

*Steak n Shake Enterprises, Inc. v. Globex Co., LLC*,
    110 F. Supp.3d 1057 (D. Colo. 2015)........................................ 23, 41

*Stoner v. Marshall*,
    145 Colo. 352, 358 P.2d 1021 (Colo. 1961) ......................................36

*Town of Alma v. AZCO Const., Inc.*,
   10 P.3d 1256 (Colo. 2000) .......................................................25

*Univ. of Denver v. Doe*,
   2024 CO 27, 547 P.3d 1129 (Colo. 2024) ......................................27

*V*, LLC,
   2015 CO 7, 342 P.3d 868 (Colo. 2015) ..........................................25
*Young v. Leech*,
   78 Colo. 208, 240 P. 692 (Colo. 1925) ...........................................34

## Statutes

28 U.S.C. § 1291 ......................................................................1
28 U.S.C. § 1332 ......................................................................1

## Rules

10th Cir. R. 28.1(A) ..................................................................1
Fed. R. App. P. 32(a)(5).............................................................50
Fed. R. App. P. 32(a)(6).............................................................50
Fed. R. App. P. 32(a)(7)(B) ........................................................50
Fed. R. App. P. 32(f) ................................................................50
Fed. R. App. P. 32(g) ...............................................................50
Fed. R. Civ. P. 50(a).................................................................III
Fed. R. Civ. P. 52(c).................................................................III
Fed. R. Civ. Proc. 52(a)(5).........................................................47
Rule 46 of the Federal Rules of Civil Procedure .............................47
Rule 50(b)............................................................................. IV

## Other Authorities

Fed. Prac. & Proc. Civ. § 2581 (3d ed.)........................................47

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

# GLOSSARY

## Parties and Other Entities

| | |
|---|---|
| The City of Fort Collins, Colorado | the City |
| Open International, LLC | Open or Open International |
| Open Investments, LLC | Open Investments |

## The Parties' Agreements

| | |
|---|---|
| Master Professional Services Agreement | MPSA or Agreement |

## Other Key Terms

| | |
|---|---|
| Request for Proposal | RFP |
| Project Change Request | PCR |
| Statement of Work | SOW |
| Open SmartFlex | OSF |

## JURISDICTIONAL STATEMENT

This Court has subject-matter and appellate jurisdiction to decide Defendants-Appellants' appeal from the final judgment. The Court has subject-matter jurisdiction because the case was a proper exercise of the district court's diversity jurisdiction, *see* 28 U.S.C. § 1332, and appellate jurisdiction because the final judgment resolved all claims by all parties, *see* 28 U.S.C. § 1291.

The district court entered its Amended Final Judgment in favor of Plaintiff-Appellee on March 28, 2024. (App. Vol. 17 at 3-4).[1] Defendants-Appellants filed a timely notice of appeal on April 17, 2024, (App. Vol. 17 at 5-6) and, after the district court disposed of all post-trial motions on August 15, 2024, they filed an amended notice of appeal on August 21, 2024. (App. Vol. 17 at 156-57).

---

[1] Pursuant to 10th Cir. R. 28.1(A), record citations are to the volume and page number of the Appellants' contemporaneously filed appendix.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

This case arises from a contract for a municipal utility billing system entered into by the City of Fort Collins ("the City") and its chosen vendor, Open International, LLC ("Open" or "Open International"), which was guaranteed by Open's parent company, Open Investments, LLC (denominated herein as "Open Investments," not to be confused with "Open," which is the appellation used exclusively for Open International, LLC).

The issues to be decided by this Court are:

(1)     Whether the parties' agreement—which incorporates by reference Open's precontractual representations, has a focused merger clause, curbs reliance on the warranties, and excludes categories of damages—precludes the City's fraud-in-the-inducement claim in light of Colorado's economic loss rule;

(2)     Whether the City's almost $20 million restitution award must be overturned because the City repeatedly affirmed the contract after learning of the problems about which it now complains;

(3)     Whether the alleged misrepresentations would be actionable regardless of Colorado's economic loss rule and waiver jurisprudence;

(4)     Whether Open Investments can be held liable for the rescission award when it was merely a guarantor of Open's performance under the contract.

# STATEMENT OF THE CASE

## *Nature of the Case*

This is a dispute arising out of an agreement for utility billing services, with the City suing Open for breach of contract and Open counterclaiming based on the City's own failure to perform. But, with an alternative claim for fraud-in-the-inducement, the City sought to avoid the restrictions adopted by the parties in their contract, which expressly incorporated Open's precontractual representations, specifically disclaimed reliance on any others, and—in conspicuous and unambiguous language—limited the damages that could be awarded to either party "regardless of the theory of liability." And, despite Open's repeated motions for judgment as a matter of law—which pointed to the lack of any actionable misrepresentation, to the contract's merger clause and other limiting provisions, and to the City's continuation of the relationship notwithstanding its knowledge of the problems it attributes to Open—the district court allowed the City to abandon its contract claim in favor of a tort remedy. Then, the court let a jury decide the liability issue but reserved the remedy determination for itself on the ground that the City had elected an equitable remedy, rescission and restitution. And, after cancelling the contract, the court entered a judgment of almost $20 million against both Open and the contract's guarantor, Open Investments, even though Open

Investments made none of the alleged misrepresentations. As discussed below, all this was error.

### Statement of Facts

#### A. *The Bid and Contract for a Bundled Utility Billing System*

In February 2018, the City published a request for proposal ("RFP") for a billing software system to cover a new broadband service the City planned to launch as well as its traditional municipal utilities (water, wastewater, stormwater, and electricity). (App. Vol. 7 at 53, 55-56, 58, 61). On March 12, 2018, Open submitted a proposal for the project based on its forthcoming software—Version 8 of Open SmartFlex ("OSF V.8"). (App. Vol. 11 at 120-21). The City selected Open to be its vendor and the parties formalized their contract with a Master Professional Services Agreement ("MPSA") that incorporates by reference Open's response to the RFP, and the first Scope of Work ("SOW"), which set out a detailed functionality matrix for the services Open was to provide. (App. Vol. 19 at 1-19; App. Vol. 20 at 1-138).

Without making any contractual representations of its own, Open Investments guaranteed Open's performance under the contract:

> Open Investments, LLC ("**Guarantor**") consents to and agrees to unconditionally guarantee the performance of Open International LLC ("**Open**") of all obligations *set forth in this Master Professional Services Agreement and the Software License Agreement . . . .*

4

(App. Vol. 19 at 5) (MPSA "Irrevocable Guarantee") (emphasis added).

Notably, the MPSA contains a number of restrictions. For example, its introduction incorporates by reference Open's precontractual "functionality matrix" and makes clear Open's grading of its capabilities were good faith estimates based on criteria that are subject to "interpretation":

> The requirements of Request for Proposal (RFP) 8697 and Open's proposal dated March 12th, 2018 are incorporated herein by reference. In the event of a conflict between the RFP, Open's proposal and/or this Agreement, the terms of this Agreement shall prevail. The Parties acknowledge that the requirements outlined in the RFP are high level _and may be open to interpretation_. Open has made good faith efforts to respond based on the capabilities of the Open Smartflex solution and the City has proceeded with reasonable reliance on Open's representations.

(App. Vol. 19 at 6) (MPSA "Introduction") (emphasis added).

The MPSA also contains a limited warranty that expressly disclaims reliance on precontractual representations, thereby making the contract the exclusive source of duty owed by Open to the City. _See_ (App. Vol. 19 at 7) (MPSA § 2.3) ("NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED FROM OPEN OR ELSEWHERE WILL CREATE ANY WARRANTY NOT EXPRESSLY STATED IN THIS AGREEMENT.").

In particular, the MPSA's "Limited Warranty" section addressed the SOW that is an Exhibit expressly incorporated into the contract with the functionality matrix attached—and spells out the duties owed and the exclusive remedy with

respect to those functionalities. In that regard, Open warranted that its consulting services "will be provided in accordance with the applicable SOWs," and that all the services "will be performed in a competent and professional manner, in accordance with usual and customary industry standards, using skilled Open employees, subcontractors or other agents having the appropriate background and skills." MPSA, § 2.1. This section of the contract goes on to provide that the City's "exclusive remedy, and Open's entire liability, for breach of the foregoing warranty, will be for Open to correct or re-perform any nonconforming Services, at Open's expense subject to Section 13.2." *Id.*

The contract also includes a limitation of liability, applicable to both parties, that provides a remedy but excludes certain types of damages "regardless of the theory of liability," and includes a ceiling on the aggregate amount the City could recover if Open's representations proved to be untrue:

> NEITHER PARTY SHALL BE LIABLE FOR: (A) ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF USE, DATA, BUSINESS, OR  PROFITS), REGARDLESS OF THE THEORY OF LIABILITY OR WHETHER THE LIABLE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) AGGREGATE DAMAGES IN EXCESS OF THE FEES PAID OR PAYABLE BY CUSTOMER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO LIABILITY.

(App. Vol. 19 at 12) (MPSA, § 12.1).

Finally, the parties agreed to a merger clause that specifically covers the functionality matrix submitted by Open in response to the RFP and which was an exhibit to the MPSA, indeed an attachment to the Statement of Work ("SOW") that was explicitly discussed in the merger clause:

> Entire Agreement; Precedence.  This Agreement, *including all Exhibits*, constitutes the *final, complete and exclusive agreement* between the Parties with respect to the subject matter of this Agreement, and supersedes any prior or contemporaneous agreement, proposal, warranties and representations. If of any conflict between the Order Form, these Terms and Conditions, an *SOW* and Exhibit B, the following order of precedence shall govern: first this Agreement, then Software License Agreement, then Exhibit B Software Support Terms.

(App. Vol. 19 at 19) (MPSA, § 18.15) (emphasis added).

Thus, in both the MPSA's introduction and its concluding paragraph—as well as the section disclaiming extracontractual warranties and representations and the section addressing remedies "regardless of the theory of recovery"—the City knowingly and intentionally waived any tort claim based on the functionality matrix in Open's response to the RFP, which is the sole subject of the City's fraud-in-the-inducement claim. *See* (App. Vol. 19 at 6) (MPSA Introduction); *id.* at 19 (MPSA § 18.5); (App. Vol. 20 at 1-138) (MPSA Ex. C Atch. 1 – SOW #1); *see also* (App. Vol. 7 at 66); (App. Vol. 8 at 15) (City's witnesses admitting that the MPSA incorporated the RFP, Open's Response, and the SOW).

## B. *The City's Failure to Devote Necessary Resources*

The project was immediately plagued by delays and disputes. But even City personnel and witnesses acknowledged that the City was to blame for much of this. (App. Vol. 8 at 29-33). Indeed, Mike Beckstead, one of the City's executives, said so in a contemporaneous presentation to the City Council, which was videotaped and made available for public viewing on the City's website. (Meeting videotape available at https://tinyurl.com/4caby22k). Beckstead acknowledged that the City lacked "leadership, management, accountability, and understanding of detail" with respect to the project—causing many of the delays and scope adjustments. (App. Vol. 8 at 66-69).

Colman Keane, the Executive Director of the City's broadband service, noted that the City failed to perform adequate system testing and should have hired an external professional project manager to oversee the project. (App. Vol. 8 at 34-35, 45-46, 201). When the City finally *did* hire an external project manager (Dr. Michelle Frey), she lamented the City's ongoing failure to provide adequate resources for a successful implementation. (App. Vol. 10 at 56-57). And when it hired TMG Consulting in January 2021 to analyze the project and advise whether the City should proceed, *id.* at 110-11, TMG's Executive Vice President acknowledged that the largest reason for the failed implementation thus far was the *City's* failure to devote the necessary resources to its success. *Id.* at 150-51.

## C. *The City's Knowledge of the Problems*

True, there were multiple delays in the implementation of the project, but the City accepted responsibility for more than half of the cost with the expressed desire to continue its contractual relationship with Open—which is the direct opposite of a party seeking to rescind a contract due to fraud. (App. Vol. 8 at 26-28, 74-75).

Moreover, the City has admitted, repeatedly, that it knew that the project would use a new version of Open's software, that it was a beta customer—the first to use this version and Open's first customer in North America—and that there was a risk in doing this. (App. Vol. 8 at 14, 60); (App. Vol. 9 at 10). Lisa Rosintowski, who worked in the customer service department for City utilities, testified that Open International had been nothing if not forthright about the new still-in-development Version 8 of the OSF software that would be implemented for the City. (App. Vol. 9 at 6-7). And multiple City employees confirmed their knowledge of this risk. (App. Vol. 8 at 56-58); (App. Vol. 9 at 10). Indeed, the "road map" in its RFP Response specifically noted that new functionalities would be added to OSF V.8 over the course of 2018. (App. Vol. 9 at 12-13).

At trial, the City claimed that the one particular functionality issue that it really cared about was the customer "self-service portal" for the broadband billing services. (App. Vol. 7 at 15) (City's Opening Statement). But early in the implementation, the City knew about—and had every opportunity to learn about—

what it later complained were the critical shortcomings in the self-service portal. When the broadband billing component of OSF V.8 went live in August 2019, the lacking functionalities with the customer portal were immediately apparent and cause for concern for the City. (App. Vol. 7 at 69, 76); (App. Vol. 9 at 28). Travis Storin, the City's Chief Financial Officer, testified that right from the start the customer portal did not meet city's expectations. (App. Vol. 7 at 69). His impression was that the portal did not have all the necessary functionalities. *Id*. at 76. Storin felt that the broadband issues were never fixed. *Id*. at 72.

Nothing about these deficiencies was hidden from view. Storin admitted that the City saw the OSF in operation when the broadband went live in 2019, and the City was able, then and thereafter, to investigate the various functionalities for itself. (App. Vol. 7 at 113); (App. Vol. 9 at 19). By as early as November 2019, Rosintowski listed as some of the City's primary concerns with the product that "portal testing hours [had been] extensive" and the "presented portal was different than what got delivered." (App. Vol. 9 at 26-27). As CFO Storin noted, "[i]t was pretty unsatisfactory trying to create the Internet utility of the future" without a functioning online customer-service portal. (App. Vol. 7 at 69). And when a third-party consultant, TMG, later gave the project a D- grade, Storin was not surprised because this confirmed his earlier belief. *Id.* at 83.

D. *The City continued to Affirm the Contract Notwithstanding its Knowledge of the Problems with the Self-Service Portal and Other Aspects of the Implementation.*

Notwithstanding the City's early knowledge of the problems, the City repeatedly affirmed the contractual relationship with Open. And it did so through a series of contractual amendments and approved project change requests ("PCRs"), including PCR 19 (addressing e-commerce issues related to the portal), PCR 23 (changing scope, deadlines, and costs), and others. *See, e.g.,* (App. Vol. 8 at 77, 150). In a memorandum dated March 29, 2020, Dr. Frey—who was then serving as the City's third-party project consultant—documented her concerns over problems with the configurability of Open's product, testing problems, and coding issue that were not what she had expected. Yet Dr. Frey still wanted the City to continue working with Open, even with the City absorbing most of the extra project cost. (App. Vol. 10 at 92). And that was well over a year before the City sued Open, claiming a right to rescind the contract.

In fact, the City continued with the contractual relationship for the next year without hinting at a fraud claim—even agreeing to a formal amendment of the contract in June 2020 that extended certain project milestones into 2021 and assigned most of the added project costs to the City. (App. Vol. 7 at 115); (App. Vol. 21 at 1-4). Another formal amendment came six months later in December 2020, with the parties agreeing to extend the project even further. (App. Vol. 7 at

116); (App. Vol. 21 at 5-6). It was this second amendment that prompted the City to hire TMG Consulting to assess the project and advise the City how best to proceed, and in its April 2021 report, TMG advised the City to continue down the road with Open, despite the substantial project delays and frustrations. (App. Vol. 7 at 119-20).

### E. *Notice of Default and MPSA Termination*

Even by April 2021, completing the project with Open as the vendor remained "Plan A" from the City's perspective. (App. Vol. 7 at 120-21, 155). But Open could not proceed with its work unless the City cured its deficiencies. So, just a few weeks after TMG produced its report to the City, Open sent the City a notice of default that identified areas in which the City's support remained insufficient and an obstacle to progress. (App. Vol. 22 at 6-14). According to CFO Storin, it was the default notice that triggered the City's claim that Open was guilty of fraud because the City felt that the default notice was a "breach of trust" on Open's part. (App. Vol. 7 at 123). In stark contrast to the City's prior acceptance of responsibility for delays and cost overruns, after receiving the default notice from Open, the City retaliated with a termination letter—which was in itself a breach of the protocol set forth in the parties' contract. *Id.*; (App. Vol. 22 at 1-5); *see also* (App. Vol. 19 at 13) (MPSA § 13.2). The City, however, did not promptly try to rescind the contract. Instead, it continued discussing with Open's management

possible options for continuing their contractual relationship. (App. Vol. 7 at 123-24); (App. Vol. 22 at 28-43).

In fact, the parties continued working together through June 2021—launching a new release of OSF V.8, and convening to discuss a new proposal from Open to complete the project. (App. Vol. 7 at 123-24). During this time—as before—the City never hinted at rescission. So, the City surprised Open on July 2, 2021, when it sued both Open and its guarantor, Open Investments, for breach of contract, negligent misrepresentation, and fraud-in-the-inducement. (App. Vol. 1 at 49-70).

### *Course of Proceedings and Disposition Below*

A. *The Pleadings*

In its Complaint and, later, its Amended Complaint, the City based its tort claims on three types of alleged precontractual misrepresentation: (1) those concerning the timing for executing the project and the level of support Open would provide, (App. Vol. 1 at 63) (Compl. ¶ 71); (App. Vol. 3 at 61) (Am. Compl. ¶ 73); (2) representations that Open's version 8 was "ready for implementation (with minimal configuration) to support the City's . . . utilities," (App. Vol. 1 at 63) (Compl. ¶ 70); (App. Vol. 3 at 61) (Am. Compl. ¶ 72); and (3) "representations about the fitness of the [OSF] product for the City's needs"—particularly with regards to the customer portal—which were contained with the functionality matrix

provided with the RFP Response." (App. Vol. 1 at 62-63) (Compl. ¶ 69); (App. Vol. 3 at 60-61) (Am. Compl. ¶ 71). The Open entities answered by pleading affirmative defenses and asserting a counterclaim for breach of contract due to the City's many failures to perform critical required actions. (App. Vol. 3 at 70-119). Later, a pretrial order summed up the defense's assessment of the critical flaws with the City's case, including the City's failure to comply with its own contractual obligations, the lack of any actionable misrepresentations on Open's part, the applicability of the merger clause and economic loss rule, and the City's waiver of a right to recover under a misrepresentation theory.  (App. Vol. 3 at 184-224).

B. *Pretrial Proceedings*

During pretrial proceedings, the parties used a shorthand naming convention that referred to Open and Open Investments collectively as "Open." And the Open defendants moved for summary judgment on the City's tort claims on several grounds, including that those claims were barred by the merger clause and economic loss rule and also failed because the City had waived them by repeatedly and continuously affirming the contract notwithstanding its knowledge of the problems that were the subject of the lawsuit. (App. Vol. 3 at 157-183). The district court, however, denied summary judgment and allowed the City to proceed with its claims for breach of contract, negligent misrepresentation, and fraud. *Id.*

Though both the contract and tort claims were anchored in representations subsumed within the parties' contract, the City argued that they carried distinct remedies that, according to the City, would allow it to elect between affirmation of the contract and *damages* or rescission of the contract and *restitution*. (App. Vol. 3 at 216-17). In response, Open and Open Investments urged the court to require the City to make a pretrial election of remedies to avoid the prejudice, jury confusion, and judicial inefficiency that would otherwise follow at trial. *Id.* at 218-20. But the district court refused, leaving for another day the question of trial presentation and when, exactly, the City would have to select its desired remedy. (App. Vol. 4 at 82-88).

That day came on October 13, 2023, when the court revealed in a telephonic status conference how it would handle the election of remedies and the submission of evidence upon which those inconsistent remedies were based. Per the court's plan, the City would present its entire case to the jury, and at the close of evidence, the jury would receive a verdict form and claim-specific jury instructions as to the City's tort claims only. (App. Vol. 5 at 58-59). Should the jury return a verdict for the City on either tort claim, then and only then would the City be required to elect a remedy. *Id.* at 59. And if at that point the City should elect to *rescind* the agreement, the jury would be dismissed, and the Court would determine the appropriate restitution as a matter of equity. *Id.*

The decision to try the tort and contract claims together ensured that Open Investments would remain an essential party at trial. By virtue of its guarantee of Open's performance under the MPSA, Open Investments would, of course, share liability with Open International for any potential verdict on the City's *contract* claims. But, for the City to hold Open Investments liable for a *tort* remedy, it would have to prove fraudulent or negligent misrepresentations on the part of Open Investments itself because there was no basis for making Open Investments responsible for a judgment against Open based on its tort liability. But the City never alleged that Open Investments had made any misrepresentations, nor that it had any vicarious liability for the representations its subsidiary had made.

## C. *The Jury Trial*

The trial started on October 23, 2023. At the close of evidence, Open moved for judgment as a matter of law on the breach of contract claim and the tort claims, essentially renewing the points it had made in its motion for summary judgment. (App. Vol. 12 at 142-146). Open again argued that it was *the City* that breached the agreement, and that there was no actionable misrepresentation to support its tort claims, which were both waived and barred by the merger clause and economic loss rule. *Id.* Importantly, the City's trial evidence focused on Open's representations in its response to the RFP without ever suggesting that Open Investments had misrepresented any fact before or after the MPSA was signed—

that is, except in its opening statement when its counsel informed the jury that when he mentioned "Open," he was referring to both defendants collectively.

After multiple questions from the jury and a modified *Allen* Charge when the jury appeared deadlocked as to one of the two tort claims, the jury returned with its verdict—finding that the City had proved fraudulent inducement and negligent misrepresentation but had waived the negligent misrepresentation claim. (App. Vol. 15 at 15); (App. Vol. 6 at 4-7). The verdict form shows that the jury also initially found that the City had waived the fraudulent inducement claim but then scratched out that finding and entered the alternative, that the City had not waived the fraud claim. (App. Vol. 6 at 4-7).

During the ensuing recess after the verdict was read, and based on the finding of liability on the fraudulent inducement claim, the Court finally required the City to elect its remedy. The City elected to rescind—leaving the matter of restitution for the Judge to determine on a later date. (App. Vol. 15 at 154). With that rescission election, Open's counterclaim for the extensive damages it suffered from the City's admitted breach of its own obligations vanished.

D. *The Bench Trial on Restitution*

The court held its hearing on restitution two weeks after the jury trial, and the parties briefed the rescission and restitution issues in post-trial motions practice. Open and Open Investments filed a motion for judgment as a matter of

law on the rescission remedy under Rule 52(c), arguing, *inter alia*, (1) that the City's evidence was insufficient to support *any* restitution award against Open Investments, which ceased to be a contractual guarantor once the City opted to rescind rather than enforce the MPSA, and (2) that, in any event, the City waived rescission as a remedy when it accepted the benefits of the MPSA for years, repeatedly affirming the contract with knowledge of the problems that were the subject of the lawsuit. (App. Vol. 15 at 160-77).

The Court denied the Rule 52(c) motion, however, and entered judgment against both Open and Open Investments in an amount just shy of $20 million ($19,891,447), which was comprised of restitution for project costs, third-party consulting costs, internal labor costs, and both pre- and post-judgment interest— notwithstanding the City's agreement to a contract that expressly disclaimed such an expansive damages award "regardless of the theory of liability." (App. Vol. 16 at 127-149); (App. Vol. 17 at 1-2); *see also* (App. Vol. 19 at 12) (MPSA, § 12.1). Moreover, the Court refused to reduce the award by the benefit the City had received by using Open's software for five months following its termination of the parties' agreement—even though the City's own expert conceded the substantial value the City received from that use. (App. Vol. 16 at 138-41). Thus, not only did the City fail to promptly seek rescission, but it never tendered back the benefit it

received from the contract without payment, thereby securing an absolute and untenable windfall.

After entry of this final judgment, Open and Open Investments again moved for judgment as a matter of law under Rule 50(b), moved for amendment of the judgment and/or new trial under Rule 59, and requested findings of fact and conclusions of law under Rule 52. (App. Vol. 17 at 7-39). But the Court ruled against those motions at oral argument and simply entered a text order on the docket reflecting their denial without explanation. (App. Vol. 17 at 154-55, 187-208). Open and Open Investments, therefore, ask this Court to act on their timely filed notice and amended notice of appeal to overturn this unjust result. (App. Vol. 17 at 156-57).

### Standards of Review

This Court reviews de novo the denial of a motion for judgment as a matter of law. *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). And the denial must be reversed if the evidence "points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Mountain Dudes v. Split Rock Holdings, Inc*., 946 F.3d 1122, 1129 (10th Cir. 2019). While a district court usually has discretion in choosing an equitable remedy, its decision will be reviewed de novo for errors of law. *Hayes v. SkyWest Airlines, Inc.,* 12 F.4th 1186, 1204 (10th Cir. 2021).

## SUMMARY OF ARGUMENT

As the City has no actionable claim for fraudulent inducement against Open, much less Open Investments, its judgment against them cannot stand. Nor can it stand as to Open Investments specifically when its *only* duty in this case arose in contract, not in tort.

The City's judgment against both defendants must be reversed for three independent reasons. First, the economic loss rule and the MPSA's merger clause bar torts that are based on, and subsumed within, the Agreement between the parties. The alleged "misrepresentations" in this case referred *only* to statements contained within Open's RFP Response—a document that all parties acknowledge was fully incorporated into the MPSA. The fact of this incorporation should have been the death knell to a fraud claim alleging the breach of *tort* duties that were no broader or more protective that those *contract* duties spelled out in the MPSA (which, by virtue of the incorporation, governed even *pre-formation* conduct). But that conclusion is doubly true because the MPSA also contained an integration clause making it, along with the RFP Response and other incorporated materials, "the final, complete and exclusive agreement between the parties." Over the entire course of dealing between the parties, there simply were no duties at law alleged to have been breached that did not *become* duties under the contract.

Second, the City was not entitled to its remedy of rescission and restitution because it had already affirmed the Agreement—multiple times—via contractual amendments made *after* learning of the problems with the software functionalities of which it now complains and the difficulties plaguing the implementation. Whether cast as a waiver or forfeiture, the City relinquished its right to the equitable rescission remedy when it did not promptly declare its intent to rescind and instead proceeded with its contractual relationship with Open. Open spent hundreds and hundreds of hours performing under the Agreement at the City's request *after* the City learned all the material facts of the so-called "fraud"; the City cannot be rewarded for failing to act sooner and instead extracting every minute of free labor and OSF software usage out of its vendor.

Third, the record is devoid of any evidence of an actual and *actionable* material misrepresentation from either Open or Open Investments. The City supported its fraud claim via reference to three categories of falsehoods allegedly presented in the RFP response: (1) the projected timing for deliverables; (2) a single errant and plainly wrong notation in the RFP response saying that OSF V.8 had been released in 2017 when the response stated elsewhere—repeatedly—that Version 8 was still in development; and (3) the assessments in the functionality matrix that "graded" the OSF software's functionality more charitably than the City believed was appropriate. But, as a matter of law, none of these

representations can support a fraud claim because (1) a representation as to a future event is not a statement of existing fact; (2) the City has admitted that it knew that OSF V.8 was not yet released when it signed the MPSA; and (3) the MPSA made clear in its introduction that RFP grading criteria were "open to interpretation" such that the grading must be deemed opinion rather than fact. And while the City's complaints have focused on the customer portal without identifying any other software functionality it claims was inferior, the City knew, before signing the contract, that Open was switching to an outsourced "Milestone" portal for OSF V.8.

Finally, the judgment against Open Investments cannot stand because the verdict finding tort liability is not supported by sufficient evidence against the parent company that served only as a guarantor of the contract. The judge's ruling that Open Investments, a mere guarantor of contractual performance, could be liable for *restitution* after rescission of the contract has no support in law or fact. The City just created an illusion of liability, using the "Open" shorthand to refer, at various times, to Open International alone _or_ the Open and Open Investments together, thereby suggesting that both companies could be liable in tort. But there is no evidence that the parent company was the alter ego of the contracting party, no theory of vicarious liability proven, and absolutely no evidence of fraud

attributable to Open Investments. At a minimum, the judgment against Open Investments must be reversed.

## ARGUMENT

### I. The City has no actionable claim for fraudulent inducement.

#### A. The merger clause/economic loss rule limits the City to a contractual remedy.

Colorado law enforces a merger clause that bars reliance on precontractual representations where, as here, the clause is specific as to the subject matter at issue. *See*, *e.g.*, *Colo. Coffee Bean, LLC v. Peaberry Coffy, Inc.*, 251 P.3d 9, 17-23 (Colo. App. 2010); *accord LBI Group, LLC v. Scanlan*, No. 23CA1265, 2024 WL 3947026 (Colo. App. July 11, 2024) (unpublished) (citing with approval *Steak n Shake Enterprises, Inc. v. Globex Co., LLC*, 110 F. Supp.3d 1057, 1082-83 (D. Colo. 2015) (holding that merger clause barred fraudulent inducement claim)).

The MPSA was quite specific with its integration of Open's RFP response into the contract and the parties' disclaimer of extracontractual representations and promises. The introduction to the MPSA incorporated by reference Open's RFP response, and the contract attached as an exhibit a Statement of Work ("SOW") that included the functionality matrix at issue here. Further, the parties agreed to a merger clause that specifically covers that SOW and attached functionality matrix:

> This Agreement, *including all Exhibits*, constitutes the *final, complete and exclusive agreement* between the Parties with respect to the

subject matter of this Agreement. . . . If of any conflict between the Order Form, these Terms and Conditions, an *SOW* and Exhibit B, the following order of precedence shall govern. . . .

(App. Vol. 19 at 19) (MPSA, § 18.15 (emphasis added).

In addition, the MPSA contains a warranty section that expressly disclaims reliance on precontractual representations, thereby making the contract the exclusive source of duty owed by Open to the City. Its "Limited Warranty" section specifically addresses the SOW that was expressly incorporated into the contract with the functionality matrix attached. That section spells out the duties owed and the exclusive remedy with respect to those functionalities. And the contract includes a limitation of liability, applicable to both parties, that provides a remedy but excludes certain types of damages "regardless of the theory of liability."

Colorado law also enforces the integration of precontractual representations in another way—through its economic loss rule. Where a contract memorializes precontractual representations, there can be no independent tort claim based on those representations because the failure to abide by one of those representations constitutes a breach of contract:

If we conclude that the duty of care owed by [the parties] was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms. . . . We hold that when parties have contracted to protect against potential economic liability, as is the case in the construction industry [and in the analogous software industry],

24

contract principles override tort principles . . . and thus, purely economic damages are not recoverable.

*BRW, Inc. v. Dufficy & Sons, Inc*., 99 P.3d 66, 74-75 (Colo. 2004).

The Colorado Supreme Court elaborated on this rule again a decade later.

*See S K Peightal Engineers, LTD v. Mid Valley Real Est. Sols. V*, LLC, 2015 CO 7, ¶ 7, 342 P.3d 868, 872 (Colo. 2015) ("'A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. If, however, the duty breached arises 'independently of any contract duties between the parties,' then a tort action premised on that breach remains viable.") (quoting *Town of Alma v. AZCO Const., Inc*., 10 P.3d 1256, 1262 (Colo. 2000)) (emphasis supplied by *SK* opinion). The *SK* opinion further explained that "any general tort duty is independent of contractual duties if the contract contains no duties or the allegedly breached tort duty is beyond the scope of the duties contained within the contract at issue." *Id*. at 875. Conversely, if the tort duty is subsumed within the contractual duties, then the economic loss rule bars the tort claim. *See id.*

Here, the comprehensive contract between these sophisticated parties set out precisely the same duty on which the City's fraud claim is based. As made clear by the City's closing argument (and its pleadings), this case turns entirely on the grades Open assigned to thousands of software functionalities in its response to the

City's RFP, and the City's claim that some of the delivered functionalities were inferior to those representations. (App. Vol. 15 at 67-75); *see also* (App. Vol. 1 at 62-63); (App. Vol. 3 at 60-61). But the parties' MPSA contract expressly incorporated by reference Open's response to the RFP and, in fact, included the functionality matrix as an attachment to the SOW that is an exhibit to and thus a part of the contract. The MPSA's warranty section expressly referred to the SOW. It also explicitly represented that Open's software services "will be provided in accordance with the applicable SOWs," and that all the services "will be performed in a competent and professional manner, in accordance with usual and customary industry standards, using skilled Open employees, subcontractors or other agents having the appropriate background and skills." (App. Vol. 19 at 6-7) (MPSA, § 2.1). These are the same tort duties the City says were breached when the functionalities were allegedly not up to the grade Open had assigned to them.

Moreover, part of the parties' bargain was that the warranty section of the contract establishes the City's "exclusive remedy, and Open's entire liability" for any shortcoming in those representations and warranties. The City expressly agreed in the contract that if functionalities were not as represented, then the exclusive remedy "will be for Open to correct or re-perform any nonconforming Services, at Open's expense subject to Section 13.2." *Id*. That was the deal the City struck and under the economic loss rule, it is stuck with it. Colorado law does not

allow the City to evade its agreement by claiming fraud-in-the-inducement based on the very same representations memorialized in the contract.

Indeed, in a recent en banc decision, the Colorado Supreme Court stressed how important the economic loss rule is to Colorado law.

> Like many other jurisdictions, we have deemed it fit to "[l]imit[ ] tort liability when a contract exists between [the] parties" because any potential nonperfromance "can be adequately addressed by rational economic actors bargaining at arms length to shape the terms of the contract." "[C]ontract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining." Precluding tort remedies in these situations makes sense because it "holds parties to the terms of their bargain. In this way, the law serves to encourage parties to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract." This is precisely the purpose of the economic loss rule—to ensure predictability in commercial transactions.

*Univ. of Denver v. Doe*, 2024 CO 27, ¶ 92, 547 P.3d 1129, 1146 (Colo. 2024) (internal citations omitted).

Accordingly, cases applying Colorado law routinely reject fraud claims where the representations and duties underlying the claim are subsumed in the parties' contract, as the tort duty is not truly "independent" in such case. For example, in *Dream Finders Homes LLC v. Weyerhaeuser NR Co*., 2021 COA 143, 506 P.3d 108 (Colo. App. 2021), *cert. denied*, 2022 WL 4238209 (2022), the appellate court held that negligent misrepresentation and fraud claims were barred

by the economic loss rule because the sophisticated parties struck a deal where contractual provisions both covered the representations and excluded the categories of damages recoverable for their breach. *Id*. at 118; *see also id*. at 122 ("The Colorado courts have held that the economic loss rule may preclude claims for negligence and intentional torts."); *id*. at 124 (holding that "tort claims additionally fail because [plaintiffs] may not recover under a tort theory damages expressly excluded under the contract"); *id*. at 125 ("Sophisticated commercial entities [as we have here] may not circumvent the exclusion of damages in their contracts by cloaking their claims in tort theories.").

The *Dream Finders* opinion presents a solid analysis of Colorado law, including a discussion of the *Bermel* and *McWhinney* decisions, which the district court found defeated the economic loss defense in this case. *Id*. at 122, 126 (addressing *Bermel v. Blueradios, Inc*., 2019 CO 31, 440 P.3d 1150 (Colo. 2019) and *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC*, 2021 COA 2, 486 P.3d 439 (Colo. App. 2021)); (App. Vol. 17 at 164-67, 188); *see also* (App. Vol. 12 at 142-43, 152 (district court considering and rejecting economic-loss-rule argument on Rule 50(a) motion). *Dream Finders* noted that "dicta" in *Bermel* and *McWhinney* suggest that the economic loss rule has only limited applicability to intentional tort claims. But the court then rejected that *dicta* because the *holdings* of other Colorado cases bar fraud claims based on

the economic loss rule. *Id* at 122 (citing *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 289 (Colo. App. 2009); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 2012 COA 129, 317 P.3d 1226, 1231, 1233 (Colo. App. 2012). *Dream Finders* also found it significant that *Bermel* and *McWhinney* did not involve "an attempt to avoid the application of unfavorable contractual language." *Id*. at 126.

The fact that neither *Bermel* nor *McWhinney* involved unfavorable contractual provisions is particularly salient here, because that point also distinguishes *Bermel* and *McWhinney* from the present case. Indeed, not only is there a contractual provision excluding certain damages "regardless of the theory of recovery" that is comparable to the clause addressed in *Dream Finders*, but there are contractual provisions that incorporate Open's RFP response into the contract and limit the reach of those representations and warranties through a specific merger clause and other explicit language. Thus, because the same representations that the City relies on govern the contractual performance, this case is not materially distinguishable from those which apply the economic loss rule to bar fraudulent misrepresentations made during the performance of the contract. In other words, these same representations are part and parcel of the contract and its performance obligations.

This rationale is illustrated by the holding in *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp.3d 1163, 1170 (D. Colo. 2018). *RE/MAX* also involved a fraud-in-the-inducement claim where a precontractual representation was incorporated into and thus became part of the contract. And, citing *BRW*, 99 P.3d at 72, RE/MAX held that "to the extent that Quicken Loans alleges misrepresentations by RE/MAX that are memorialized in the Agreement or Amendment, the parties allocated risk with respect to those obligations by contract, and tort claims based on those obligations are barred by the economic loss rule." *Id.* at 1170.

In light of this Colorado case law, it must be concluded that, unlike the cases cited by the district court, this case matches the scenario where the economic loss doctrine defeats a fraud-in-the-inducement claim under Colorado law because the City's fraud claim is not truly independent of the contract; rather, it is inseparable from the duties embodied in the MPSA. It must be remembered that this case involves sophisticated parties who went to great lengths to negotiate the scope and boundaries of liability with respect to the functionality matrix that eventually became part of their contract. And the contract explicitly defines both the duties arising from the functionality of the matrix and the limitations on remedies if those representations were later shown to be inaccurate. To allow the City to recover almost $20 million under a fraud theory it repeatedly disclaimed when it signed the

MPSA would eviscerate the freedom of contract that is a fundamental premise of Colorado law.

**B.**    **The City affirmed the contract through multiple amendments after the problems were known, thereby forfeiting its right to the equitable remedy of rescission.**

The trial evidence showed without dispute that, by the Spring of 2020, the City had knowledge of multiple problems with the OSF software and its implementation. Specifically, the City knew in 2018 that OSF V.8 had not been installed for any other customer and was untested. (App. Vol. 8 at 14, 60) (Beckstead agreeing that he knew that OSF V.8 was "untried and unproven," that the city was taking a risk, and that the City was going to be the "beta customer for this version of OSF"); (App. Vol. 9 at 10) (City employee Lisa Rosintoski testifying that the City realized that using this new version was a risk).

In late 2019, the City complained that the portal it received was not satisfactory and was not the portal represented during the vendor-selection process or in Open's RFP response. (App. Vol. 22 at 24-27, 44-47); (App. Vol. 8 at 138) (City employee Colman Keane testifying that, in a September 2019 meeting on the project, the "portal" was unfinished and admitting that a working portal was not delivered with the broadband launch in August 2019); (App. Vol. 9 at 26-27) Rosintoski testifying that, by November 2019, one of the City's concerns was that

the "presented portal" differed from the portal delivered); (App. Vol. 10 at 40)

(Michelle Frey testifying that the "portal was a problem all along"). By early 2020

(at the latest), the City knew that the total successful delivery of functionalities was

only 58% when OSF was launched for broadband in August 2019. (App. Vol. 22 at

18-23); (App. Vol. 10 at 39).

By the spring of 2020, City employees admitted that the City was having

"significant" issues with Open's product, but nevertheless signed the First

Amendment to the Agreement on May 28, 2020, agreeing to be responsible for

55% of the increased costs. (App. Vol. 8 at 231-33); *see also* (App. Vol. 21 at 1-4)

(First Amendment); (App. Vol. 8 at 90, 97) (Beckstead testifying about an April

2020 email listing "ongoing issues with Open's product" but still contemplating a

cost-splitting amendment furthering the project). City workers also complained

that the implementation of OSF had become a "development project" rather than

the promised implementation of an out-of-the-box system, and that OSF was not

ready for the North American market. (App. Vol. 9 at 142) (City employee Mona

Walder testifying that she "opened hundreds of issues related to the portal,"

confirming the feeling that she "was doing software development" and that "Open

should have paid me to create their portal"); (App. Vol. 22 at 18-23, 28-43, 52-54).

As Frey admitted, the "portal was a problem all along," even though it was

very important to the City. (App. Vol. 10 at 40); (App. Vol. 7 at 69) (Storin

testifying that when broadband went live in 2019, it did not meet the City's expectations, primarily because of issues with the customer portal).

Nonetheless, despite all this complaining about the functionality of the portal, in the Spring of 2020, in response to concerns with eCommerce related to the portal, the parties entered into PCR No. 19, which was meant to address these issues and deliver "[c]omplete eCommerce functionality." (App. Vol. 21 at 7-9).

Thus, according to City employee Rosintoski, when Dr. Frey was assessing the project in early 2020, "her eyes were opened on the product and what the functionality was" and she expressed concern, but the City still went ahead with amending and continuing their contractual relationship with Open International. (App. Vol. 8 at 229). In fact, Dr. Frey, one of the City's project managers, testified that the City did not have to continue the relationship with Open—that it could, at any moment, terminate the project with Open and complete it with a different vendor—yet it knowingly chose to continue the contractual relationship. (App. Vol. 10 at 46-47, 63).

Even when the City eventually claimed fraud and threatened rescission in its May 28, 2021 termination letter, the City was equivocal and offered alternatives to rescission. (App. Vol. 22 at 11-13). Aaron McClune, the final project manager, testified that work on the project *with Open* continued until July 2, 2021—more than a month after the City sent its letter purporting to end the project. (App. Vol.

11 at 50-51). And the City continued to use Open's software until the end of 2021. (App. Vol. 14 at 205)**;** *see also* (App. Vol. 7 at 112-13) (Travis Storin, the City's former CFO, testifying that the City continued using the OSF license operate OSF for months after the City filed this lawsuit).

In sum, the City affirmed the contract knowing of the problems and used Open's broadband billing software services for <u>*nearly two years*</u> before seeking rescission. (App. Vol. 22 at 48-51); (App. Vol. 8 at 158-60); (App. Vol. 9 at 20-21). And, despite continuing to use the OSF product after terminating the contract and purporting to seek rescission, the City never tendered back the value it had received for Open International's post-termination services. Indeed, it opposed a set-off when seeking recessionary damages from the trial court.

Thus, the City's own admissions negate its rescission claim. A party waives the right to rescission as a matter of law if it does not "promptly" and "unconditionally" rescind the contract after discovering the facts giving rise to the fraud. *Gladden v. Guyer*, 162 Colo. 451, 458, 426 P.2d 953, 956 (Colo. 1967); *see also Gerbaz v. Hulsey*, 132 Colo. 359, 363–64, 288 P.2d 357, 359 (Colo. 1955) (en banc) (party seeking to rescind must "give notice of his intention to rescind promptly upon learning of the alleged fraud or misrepresentation"); *Young v. Leech*, 78 Colo. 208, 212, 240 P. 692, 693 (Colo. 1925) ("Where a party desires to

rescind, he must do so within a reasonable time after he comes aware of facts or circumstances that entitle him to a rescission.").

Critically, "[i]t is not requisite that the defrauded party shall be acquainted with all the evidence constituting the fraud before the duty to act by way of rescission arises." *Gladden*, 426 P.2d at 955. Rather, once a party "has evidence sufficient to reasonably actuate him to rescind the contract . . . no subsequent discovery of cumulative evidence can operate to excuse waiver of the fraud if one has in the meantime occurred, or to revive a once lost right of rescission." *Id.*; *Halm v. Wright*, 63 Colo. 419, 422, 168 P. 36, 37 (Colo. 1917); *see also Eitel v. Alford*, 127 Colo. 341, 354, 257 P.2d 955, 961–62 (Colo. 1953) (en banc) (remedy of rescission "was lost by reason of unreasonable delay . . . when the facts were known, or readily ascertainable," even where the contract was the result of "actual misrepresentation, fraud or deceit").

When rejecting the opposition to the rescission claim in this case, the district court erred by relying on two inapposite cases holding that ratification or waiver of the fraud requires "full knowledge" of the fraud: *In re Mascio*, 454 B.R. 146, 151 (D. Colo. 2011) and *Elk River Assocs. v. Huskin,* 691 P.2d 1148, 1154 (Colo. App. 1984). (App. Vol. 16 at 133-35). But those cases did not involve the rescission remedy. In *Elk River*, the case was submitted to the jury only as a suit for damages after "affirming the agreement," and the Court therefore only considered whether

an action for damages had been waived, not whether there was waiver of the equitable remedy of recession, which is governed by the rules cited above. 691 P.2d at 1150, 1153-54 (rejecting argument that plaintiff waived a damages action based on lost benefit of the bargain due to fraud). Similarly, *Mascio* did not involve a rescission claim, only a claim for damages where the plaintiff had affirmed the contract but wished to recover losses occasioned by the fraud. 454 B.R. at 153. In contrast, where the plaintiff seeks the rescission remedy, it must act promptly even without "full knowledge" of the extent of the fraud. *Gladden*, 426 P.2d at 955.

Moreover, even if *Elk River* and *Mascio* were relevant to a rescission claim, (which they are not), they must yield to long-standing Colorado Supreme Court authority holding that the "full knowledge" requirement comes into play only if "one elects to affirm the agreement . . . and thereafter continues to carry it out and receive its benefits," which would then result in a remedy of damages, not rescission. *Stoner v. Marshall*, 145 Colo. 352, 355, 358 P.2d 1021, 1023 (Colo. 1961); *see also Gladden*, 426 P.2d at 955-56 (duty to rescind arises where evidence is sufficient to "reasonably actuate" party to existence of fraud); *Halm*, 168 P. at 37.

Because the City sought to rescind the contract (and obtain restitution) rather than affirm it (and obtain damages), the "full knowledge" standard found in the

"ratification" cases does not apply here. In any event, the trial evidence shows without dispute that the City continued its participation in the contract with Open International for months after it had ample knowledge of the material functionality issues with the portal that dominated its concerns. The City could have rescinded the contract when it gained that knowledge if that representation truly had been tainted by fraud. Instead, it continued with the contractual relationship for a year and a half, repeatedly amending the contract and accepting project change requests. Because the City continued to accept the benefit of Open's services and software license for months while proposing and considering alternatives to rescission, the City waived any right to rescind the contract. *See Holscher v. Ferry*, 131 Colo. 190, 194–95, 280 P.2d 655, 657–58 (Colo. 1955) (en banc) ("If a party, having a right to rescind a contract, does any act which amounts to an admission of the existence of the contract, he cannot afterwards elect to treat it as void. A party cannot rescind and at the same time retain a benefit under the contract."); *Gladden,* 426 P2d at 956 (where a letter sent to the seller was equivocal and suggested an alternative remedy to rescission, that conduct was "totally irreconcilable" with what is required to rescind).

Finally, the district court erred in allowing the rescission remedy on the ground that the jury found that the City did not waive its fraudulent inducement claim. That is because, as was argued in the motions for summary judgment and

37

motions under Rule 50(a) and (b), the waiver issue never should have gone to the jury in the first place, as undisputed evidence—admissions from the City's own employees—negate this claim as a matter of law.

### C.     There was no material misrepresentation.

When the trial started, the City's counsel told the jury that its fraud claim is based on three purported misrepresentations: (i) the projected timing for deliveries (which was a future act that cannot constitute fraud); (ii) the plainly incorrect statement buried in the RFP response saying that version 8 of the software had been released in 2017 (even though the RFP response repeatedly stated elsewhere that version 8 would not be released until 2018); and (iii) Open's self-grading within functionality matrix and complaints that it used the "Milestone" portal rather than its own (even though this was known to the City prior to contracting). *See* (App. Vol. 12 at 196-97) (City learned, and later approved, that Open would use the Milestone portal during its April 2018 presentation to the City).

Notably, though the City challenged a percentage of the grading as inaccurate, its focus at trial was on the portal issues. In any event, the grades given to the various functionalities are not actionable misrepresentations because the MPSA, in its introduction, acknowledged that the criteria for the RFP response was "open to interpretation." In other words, the grading of a functionality was a

judgment call, not a statement of fact, and so the grading cannot support fraud liability.

Further, there is nothing to show that the grading was substantially inflated. Hernando Parrott provided unrefuted trial testimony explaining that the RFP's instructions for grading addressed functionalities contained in Open's "base system" or "base code," not functionalities in a released version of the software. (App. Vol. 12 at 182-95). And the instructions acknowledged that even functionalities with a "Grade A" would need additional work in order to configure them as needed for a future implementation. *Id.* at 182; *see also* (App. Vol. 11 at 42). ("[T]here are literally five-plus things we call configuration."). By definition, these functionalities were never supposed to be available "out-of-the-box."

Nor can the City's fraud recovery be sustained just because an internal Open document (Trial Exhibit 74) sorted the functionalities using different criteria for a different type of internal analysis. As Mr. Parrott explained, for the first category in the internal analysis, Open included only those functionalities that already had been integrated into version 8 which, though not released yet, had been in the works for three years already. (App. Vol. 12 at 190). Thus, the first category was properly graded with an "A." *Id*. The second category in the internal document also addressed fully developed functionalities existing in the base system, but for internal purposes, Open included them in a separate category from the first because

these functionalities had not yet been integrated into version 8. *Id*. at 191-92. They

still deserved a Grade A, however, because they fit the RFP's criteria for an A

grade, which looked to whether the functionality existed in the "base system," not

whether it had been integrated into a particular software version. *Id.* Mr. Parrott

went on to explain how the remaining categories in the internal document

corresponded to the RFP grading criteria and why the grades they were given were

accurate when the RFP grading structure was applied. *Id*. at 193-95.

So, though the City tried to impeach Mr. Parrott on this subject, nothing

contradicted his testimony. His testimony makes sense considering that Open had

been working on version 8 for years and had every right to sort these

functionalities this way for internal purposes. The evidence when considered as a

whole leaves but one conclusion—the sorting done in Trial Exhibit 74 is

completely consistent with the grading instructions found in the RFP, which the

MPSA itself acknowledges are "open to interpretation." In fact, the City's own

expert witness, Jon Brock, corroborated Mr. Parrott's testimony when he conceded

that even unreleased software can have functionalities that are developed. (App.

Vol. 11 at 133).

Colorado law is well established. A fraud claim cannot succeed based on a

future representation such as a projected delivery schedule. *Myers v. Alliance for

Affordable Servs*., 371 Fed. Appx. 950, 958 (10th Cir. 2010) (affirming dismissal

of negligent misrepresentation claim where alleged misrepresentations "related to the occurrence or non-occurrence of a future event"). Nor, for that matter, can it rest on articulations of opinion or belief. *Steak n Shake Enterprises, Inc.*, 110 F. Supp. 3d at 1082. Fraud cannot be based on a representation that the plaintiff knew was untrue, such as the incorrect statement that OFS.8 had been released in 2017. *ConcealFab Corp. v. Sabre Indus., Inc.*, 2017 WL 6297672, at *4 (D. Colo. Dec. 11, 2017) (no justifiable reliance where, before contracting, party knew the truth about facts later alleged to have been mischaracterized to induce the contract). And it goes without saying that fraud cannot be based on a true statement, which is the case with Open's grading of the remaining functionalities, as explained by Mr. Parrott's unrefuted direct testimony.

## II. Open Investments cannot be liable for the rescission damages.

Open Investments was made a party-defendant solely because of its role as the guarantor of Open's performance under the MPSA, and it was brought to trial solely to answer for Open's alleged breach of that agreement. So, once the City elected to rescind the contract, it should have been let out of the case. But the district court held that, even if the City failed to adduce any evidence of Open Investments' liability for fraudulent inducement independent of its liability under the contract, its objection to being included in the judgment came too late. (App. Vol. 16 at 135-36). That is not right, however. As soon as the City chose the

rescission remedy, Open Investments forcefully sought judgment in its favor.

(App. Vol. 15 at 165-67). By finding that Open Investments forfeited its right to an individualized assessment of its liability, the district court absolved the City of its burden of persuasion to prove the liability of each defendant individually. The City eschewed that responsibility by sleight-of-hand, using "Open" as a trial shorthand to refer to both defendants collectively. But this naming convention does not create alter ego liability. And there was no legal theory advanced whereby the _tort_ liability of Open could be expanded to include some sort of vicarious liability attributable to its parent company. There is no basis for including Open Investments in this judgment.

### A.     Open Investments cannot be liable because it made no misrepresentations.

The pre-verdict Rule 50(a) motion argued that the City failed to present evidence of (1) a misrepresentation of a *past or present fact*; (2) justifiable *reliance* on any such misrepresentations; or (3) a *knowing* misrepresentation. *See* (App. Vol. 5 at 122-25). Although those arguments were sharpened in the post-verdict Rule 50(b) motion, the sufficiency challenges in that latter motion were aimed at the same elements of the same claims—adding additional color by parsing the evidence as to each defendant individually. *See* (App. Vol. 6 at 147-53).

This is enough to preserve Open Investments' objection to the large restitution judgment entered against it. Although sufficiency arguments presented for the first time in a Rule 50(b) motion cannot be considered unless first asserted in a Rule 50(a) motion, when it comes to matching those arguments across the Rule 50(a) and 50(b) papers, "technical precision is unnecessary," both in the Tenth Circuit and elsewhere. *See Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255–56 (10th Cir. 2017) (permitting Rule 50(b) arguments that appellant argued were not raised with sufficient specificity in Rule 50(a) motion).

Moreover, the record is clear. The City's case against Open Investments always was in contract rather than tort. And Open Investments' status as a guarantor cannot support a judgment against it for fraud based on representations made in the RFP response that Open Investments did not author or submit. As the City itself acknowledged in its closing argument: "The fraud and negligent misrepresentation claims are focused on conduct from before the contract and the City's discovery of those misrepresentations." (App. Vol. 15 at 81-82).

The RFP response on which the City relies for its judgment was authored and submitted by Open *alone* and in no way reflected the "statements" of Open Investments. The City's insistence to the contrary has focused on either (1) Open's unchallenged remarks touting the experience of *others* within the "Open" portfolio of companies, *see* (App. Vol. 17 at 86-87) (citing "30 years of experience";

43

"worldwide recognized"; "decades of" development and implementation), or (2)

precontractual review and gladhanding by Open Investments' CEO William

Corredor who evaluated the RFP Response for "historical accuracy" and met with

the City during the response process. *See id.* at 87. *But that is all, and none of that*

*amounts to an actionable misrepresentation.* Such background involvement cannot

subject Open Investments to liability here.

Indeed, as the City's counsel stressed in his closing argument, the City's

fraud case boils down to the grades Open assigned to *its* new software version in

the functionality matrix incorporated into the RFP as contrasted with an internal

document, (App. Vol. 22 at 15-17 (Trial Ex. 74)), created by Open when

addressing the functionalities of its new software version. (App. Vol. 15 at 67 (the

City's attorney saying in closing argument that "Open lost this case" when

evidence of their internal grading system (Exhibit 74) was introduced "and instead

of using that accurate internal grading system when they responded to the City's

RFPs, they gave false grades to the City[.] . . . [T]his is fraud."); *see also id.* at 68-

69 (similar), 75 (stating that Open made the misrepresentations / grading in the

RFP knowing it was false and with the intent that the City would rely on it, even

though it conflicted with their own grading system). But Open Investments, the

parent company, was not involved in that functionality assessment. All the trial

testimony on that subject shows that this was done by Open International employees. Open Investments simply wasn't involved.

The City's bald assertion that fraud was perpetrated by *both* Open entities has no support anywhere in the record—not in the complaint or pretrial order, which limit the allegations against Open Investments to its execution of a pledge in the Agreement to "unconditionally guarantee the performance of Open International of all obligations set forth" in that document. (App. Vol. 19 at 5) (App. Vol. 3 at 206) (sole mention of Open Investments in the pretrial order). And there is no trial evidence to support that assertion either.

### B.     Open Investments owes no restitution.

Considering that there is no evidence of any misrepresentation by Open Investments, the district court exceeded its authority to subject it to an *equitable remedy* for damage that it did not cause or value it did not receive. Again, the two Open entities were grouped together by a shorthand reference for purposes of convenience only, and this was not an admission by Open Investments of any vicarious liability beyond that which was established by its status as a guarantor of the contract. Moreover, once the proceedings shifted to the district court to determine an equitable remedy of restitution, the district court was tasked with determining both the law *and* the facts that were necessary to that decision—a decision that was beyond the purview of the jury. *Palace Expl. Co. v. Petroleum*

45

*Dev. Co.*, 316 F.3d 1110, 1119 (10th Cir. 2003) (observing that a district court is only bound by a jury's determination of factual issues common to both the legal and equitable claims).

Here, *no aspect of the jury's verdict bore on the City's entitlement to a restitution award from Open Investments*, and indeed, neither damages nor restitution were even discussed at the jury trial pursuant to the bifurcated procedure the district court judge imposed. Restitution was solely within the court's province to decide, and Open Investments neither invited the court's error nor caused prejudice to the City by demanding disambiguation of the two Open entities in advance of a restitution hearing at which the City could have proffered, and the court could have received, additional evidence reflecting Open Investments' *individualized* responsibility for restitution (of which there is none).

Unlike Rule 50, Rule 52 expressly permits a party to challenge the sufficiency of the evidence supporting the judge's findings whether or not it requested findings, objected to them, moved for amended or additional findings, or moved for judgment on partial findings. *See* Fed. R. Civ. Proc. 52(a)(5). There is no requirement "for a party seeking to question the sufficiency of the evidence on appeal to have made an objection in the district court to the findings or to have made a motion to amend them or a motion for judgment." Wright & Miller, Fed. Prac. & Proc. Civ. § 2581 (3d ed.). At bottom, a challenge to *judicial* fact-finding

simply is not defeated by the City's insistence that Open Investments waited too long to object to being subjected to liability for the fraud claim advanced against its subsidiary.

Finally, Rule 46 of the Federal Rules of Civil Procedure provides that, in all other contexts, "[f]ailing to object does not prejudice a party who had no opportunity to do so when the ruling or order was made." And here, there was no reason for Open Investments to object to being included in a restitution award before the City elected the rescission remedy, thereby abandoning the contractual claim that brought Open Investments into this case in the first place. Open Investments raised the issue as soon as practicable following the jury's verdict and the City's election of rescission, and despite the benefit of full briefing, the Court deemed forfeited a matter that had not been relevant before, not even *implicitly*.

Simply put, there is no factual or legal basis for holding Open Investments liable for restitution based on a fraudulent inducement claim where Open Investments made no misrepresentations of any kind and merely served as the guarantor of a contract the City has since rescinded.

## CONCLUSION

For the foregoing reasons, the Court should reverse the denials of Defendants-Appellants' motions for judgment as a matter of law and remand with instructions that judgment be entered in their favor.

## STATEMENT CONCERNING ORAL ARGUMENT

This appeal warrants oral argument, as it addresses a complex commercial transaction, an extensive record (including a 10-day trial), a significant judgment, some extraordinary procedural maneuvers, as well as important issues of Colorado law involving the economic loss rule and the standard applicable to waiver of a rescission remedy as opposed to waiver of an action at law where the plaintiff has affirmed the contract but seeks damages due to fraud. The Court's work would be well served by the opportunity to question counsel for both sides on these issues of fact, law, and procedure.

Dated: November 14, 2024                    Respectfully submitted,

*/s/ Laurie Webb Daniel*
Laurie Webb Daniel
**Webb Daniel Friedlander LLP**
75 14th Street NE
Suite 2450
Atlanta, Georgia 30309
T: (404) 433-6430
laurie.daniel@webbdaniel.law


Jeffrey Keith Sandman
**Webb Daniel Friedlander LLP**
5208 Magazine Street
Suite 364
New Orleans, Louisiana 70115
T: (978) 886-0639
Jeff.sandman@webbdaniel.law

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 32(g):

   [X]   this document contains [11,383] words, **or**

   [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [X]   this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

   [ ]   this document has been prepared in a monospaced typeface using _____ with _____.

DATE: November 14, 2024

*/s/ Laurie Webb Daniel*
Laurie Webb Daniel
**Webb Daniel Friedlander LLP**
75 14th Street NE
Suite 2450
Atlanta, Georgia 30309
T: (404) 433-6430
Laurie.Daniel@webbdaniel.law

*Attorney for Defendants-Appellants*

## CERTIFICATE OF DIGITAL SUBMISSION AND
## PRIVACY REDACTIONS

All required privacy redactions have been made to this document, and with the exception of those redactions, every document submitted in digital form is an exact copy of the written document filed with the clerk. Said document has been scanned for viruses and, accordingly, is free of viruses.

*/s/ Laurie Webb Daniel*
Laurie Webb Daniel


## CERTIFICATION OF SUBMISSION OF HARD COPIES OF PLEADING

I hereby certify that the seven (7) copies of this pleading required to be submitted to the clerk's office will be exact copies of the ECF filing.

*/s/ Laurie Webb Daniel*
Laurie Webb Daniel

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of November, 2024, I electronically filed the foregoing Defendants-Appellants' Opening Brief with the Clerk of the United States Court of Appeals for the Tenth Circuit using the Court's appellate CM/ECF system.

I further certify that all parties are represented by counsel of record who are registered CM/ECF users and who will be served by the Court's CM/ECF system.

*/s/ Jeffrey Sandman*
Jeffrey Sandman

# ATTACHMENTS

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3
    Civil Action No. 21-cv-02063-CNS-SBP
4

5    CITY OF FORT COLLINS,
                                    (Pages 1085 - 1378)
6        Plaintiff,

7        vs.

8    OPEN INTERNATIONAL, LLC,
    and OPEN INVESTMENTS, LLC,
9
         Defendants.
10
    ----------------------------------------------------------------
11
                    REPORTER'S TRANSCRIPT
12                  Jury Trial - Day 6

13  ----------------------------------------------------------------

14   Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
    United States District Court for the District of Colorado, and
15  a jury of eight, commencing on the 30th day of October, 2023,
        in Courtroom A-702, United States Courthouse, Denver,
16                         Colorado.

17                        APPEARANCES

18  For the Plaintiff:
    CASE L. COLLARD and ANDREA A. WECHTER and MARAL SHOAEI, Dorsey
19  & Whitney LLP, 1400 Wewatta St., Ste. 400, Denver, CO 80202

20  JOHN R. DUVAL, Fort Collins City Attorney's Office, P.O. Box
    580, Fort Collins, CO 80522
21
    For the Defendants:
22  PAUL D. SWANSON and ALEXANDRIA E. PIERCE and ALEXANDER D.
    WHITE and KEVIN C. MCADAM, Holland & Hart LLP, 555 17th St.,
23  Ste. 3200, Denver, CO 80201

24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                Denver, CO 80294, 303-335-2108
         Proceedings reported by mechanical stenography;
              transcription produced via computer.

21-cv-02063-CNS-SBP   Jury Trial - Day 6   10/30/2023   1235

1  functionalities of the software, and there was significant

2  testimony on that.

3          THE COURT:  And the declaratory judgment part?  What

4  are you seeking declaratory judgment of?  Let me word it that

5  way.

6          MS. WECHTER:  I don't have that in front of me.

7  Excuse me, Your Honor.  Your Honor, I believe it kind of

8  encompasses the same issues, but it would be for Your Honor's

9  decision, and we would need all the evidence in before that.

10         THE COURT:  All right.  Okay.  Well, why don't you

11 have a seat.  Let me go through this in the order that the

12 defendant presented it.  For largely the same reasons that

13 were in the order on motion for summary judgment, I'll deny

14 defendants' Rule 50(b) motion with the exception of the

15 declaratory judgment.  I don't find that to be proper at this

16 stage.  There's been no evidence that there's anything that I

17 would need to do separate and apart from the breach of

18 contract claim, so that will be granted, and that will no

19 longer be in the case.

20         With respect to the fraud, I find the plaintiff has

21 presented sufficient evidence from which a jury could conclude

22 that there was a misrepresentation on a current fact.  While

23 defendant, I realize, has called it a typo, it is in there,

24 and I think the jury needs to be able to reach its decision

25 based on that, and it is not proper for me to take that from

Sarah K. Mitchell, RPR, CRR

Att.2

21-cv-02063-CNS-SBP    Jury Trial - Day 6    10/30/2023    1236

 1    them.

 2            I would also note that I don't -- I don't think the

 3    evidence even aside from that typo is clear that they were not

 4    representing a current product.  Again, there's the dispute

 5    about what is A versus what B means.  To me, that is

 6    completely a jury decision to conclude whether defendant was

 7    making those representations as to a current fact or a fact in

 8    effect at the time the product went live, so that will go to

 9    the jury.

10            The economic loss rule I've already dealt with in the

11    summary judgment order, and I won't add anything new to that.

12    Same thing for the negligent misrepresentation claim.  The

13    analysis would apply in total to that.

14            The waiver claim, again, I find those to be questions

15    of fact.  I understand defendants' argument.  I think it's an

16    interesting argument, but I find that to be within the realm

17    of the jury's decision.  I think there's evidence from which

18    they could determine that the City should have moved for

19    rescission or said they were rescinding earlier and didn't,

20    but there's also evidence that at the point of spending that

21    much money, they made a reasonable decision to proceed.  So I

22    find that to be a question for the jury.

23            The breach of the contract claim, again, same --

24    mainly the same issues.  The waiver seems to be the most

25    interesting issue there, but I find that to be a jury decision

                        Sarah K. Mitchell, RPR, CRR

21-cv-02063-CNS-SBP    Jury Trial - Day 6    10/30/2023    1237

1    as to whether the first amendment and the PCR 29 somehow would

2    have put the City on notice or if that's the City's acceptance

3    of new terms.  I find all of that to be within the realm of

4    the jury's decision-making process.

5         Let's just talk about damages a little bit.  Well,

6    let me go to the implied covenant.  I'm going to leave that

7    in.  I invite the defendant to re-move at the close of

8    evidence.  I'm not sure there's enough here for that claim.

9    I'm leaving it in the interest of caution at this point.

10   There has been some discretionary items focused on by the

11   plaintiff largely in argument versus evidence.  So let's

12   revisit that at the close of evidence to see what comes out

13   through defendants' witnesses on that point.

14        With respect to damages, yes, absolutely.  In terms

15   of the breach, the contract damages limitation will be

16   applied.  There is a dispute as to when that time period kicks

17   in.  We will deal with that in the jury instructions, but,

18   yes, that absolutely will be how this proceeds in the jury

19   instructions and on the verdict form.

20        I understand defendants' position on the objection --

21   or the election of remedies.  While I am sympathetic to that,

22   I feel my decision to have the jury consider the fraud and

23   negligent misrepresentation first, come back and tell us what

24   that is, force an election at that point somewhat prevents the

25   City from having its cake and eating it too because it will

Sarah K. Mitchell, RPR, CRR

Att.4

21-cv-02063-CNS-SBP    Jury Trial - Day 6    10/30/2023    1238

1    have to make a decision at that point and will not be able to

2    see what the jury's decision is on breach or waiver or any of

3    those items before electing.  So, again, when that happens,

4    the City will be asked to elect immediately if there is a

5    finding in their favor on those claims.

6         I think that is all I needed to rule on with respect

7    to defendants' motion.  So with that said, we will come back

8    at 1:15.

9         MR. SWANSON:  Your Honor, I don't think we heard a

10   ruling on fraud and negligent misrepresentation damages as

11   distinct from the contract damages.

12        THE COURT:  You're absolutely right.  So I don't

13   think I need to make another ruling.  What I said at the

14   beginning of the case is I will do those damages.  So the jury

15   will not receive instructions on that should the breach of

16   contract claim go forward, mainly because, one, negligent

17   misrepresentation seems to only be seeking rescission.  The

18   fraud is more questionable.  But I think the *Trimble* case does

19   apply there.  There could be some element of damages, but thus

20   far I agree with defendant that I haven't heard what it would

21   be in addition to the breach of contract damages.

22        But in terms of rescission, any damages other than

23   rescinding the contract and returning the amounts paid will be

24   done by me, to the extent there are other damages that are

25   available under that claim, which essentially what I would say

                    Sarah K. Mitchell, RPR, CRR

21-cv-02063-CNS-SBP    Jury Trial - Day 6    10/30/2023    1239

1    is if the City elects rescission -- if there's a finding and

2    the City elects rescission, what I would do is have the

3    parties brief the issue of damages and we'd hold a hearing on

4    that.  So don't feel like you need to have that all ready to

5    go if you do elect -- if there is a finding and you do elect

6    rescission.  We would set a separate hearing on.

7         MR. SWANSON:  Thank you, Your Honor.

8         MR. COLLARD:  Just a quick clarification, and I might

9    be listening too closely for my own good.  But you said

10   something about we'll have to elect not knowing about the

11   contract and waiver and all those other things.  But on

12   potential waiver of the fraud, you said that was a jury issue,

13   so we would know about that when we were electing because that

14   would be part of the first set of instructions.

15        THE COURT:  It would be part of the first set,

16   because essentially in our first set, which, again, we hope to

17   have to you after lunch.  I'm looking at the final draft

18   during lunch.  So in the first set you will see there is a

19   waiver instruction on the fraud.

20        MR. COLLARD:  Thank you.  Good to go.

21        MR. SWANSON:  And sorry.  Does that include the

22   rescission-specific waiver standard that is, like, the

23   requirement that a claimant rescind immediately once they are

24   aware of the basis for rescission?

25        THE COURT:  I think it has language similar to that,

Sarah K. Mitchell, RPR, CRR

Att.6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-02063-CNS-SBP

CITY OF FORT COLLINS, a Colorado home rule municipality,

      Plaintiff,

v.

OPEN INTERNATIONAL, LLC, a Florida limited liability company and
OPEN INVESTMENTS, LLC, a Florida limited liability company,

      Defendants.

---

**ORDER**

---

    This matter comes before the Court on Defendants' Motion for Judgment under Rule 52(c), ECF No. 314, as well as the parties' respective closing briefs regarding amounts, if any, which may be recovered in recission by Plaintiff, the City of Fort Collins (the City), *see* ECF Nos. 314, 315.[1]

    On November 3, 2023, a jury determined that Defendants, Open International, LLC and Open Investments, LLC (collectively, Open) had fraudulently induced the City to enter into the Agreements[2] for the development of billing software. *See* ECF No. 296. One day prior, the Court granted the City's motion for judgment as a matter of law with respect to

---

[1] Unless otherwise noted, record citations are to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generate page numbers placed at the top of the documents.

[2] These Agreements included the Master Professional Services Agreement, Scope of Work, and First Amendment to the MPSA.

1

Att.7

Open's affirmative defenses of laches and unclean hands, finding that Open had failed to prove either. *See* ECF No. 312 at 54:6–22. Following the jury's fraudulent inducement determination, the City elected to rescind the Agreements. ECF No. 313 at 31:7–12. On November 17, 2023, the Court held a hearing at which the parties presented expert testimony on appropriate restitution amounts in rescission.[3] *See generally* ECF No. 301. At the hearing's conclusion, the Court further invited the parties to brief the issue of amounts owed to the City in restitution. *See id.* at 132:18–134:8. That issue is now fully briefed.

Broadly speaking, the parties' briefing centers on five categories of expenses requested by the City: (1) amounts the City paid to Open under the Agreements; (2) amounts the City paid to third-party consultants; (3) the City's labor costs; (4) the City's lost net revenue; and (5) the City's attorney's fees and costs. *See* ECF No. 315 at 2. The City further requests pre-judgment interest for categories (1) through (4), and post-judgment interest in all five categories. *Id.* Separately, Open includes a motion for judgment under Rule 52(c) in its restitution brief, arguing that the City waived rescission as a remedy and that rescission liability cannot lie against Open Investments. *See* ECF No. 314 at 2–8.

---

[3] "When a party recovers money damages in connection with rescission, those damages are more accurately called restitution: The term recission refers to the avoidance of the transaction or the calling off of the deal," whereas restitution (commonly in the form of monetary payment) occurs once the transaction is avoided. *Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 841 n.8 (Colo. 2004) (citations omitted); *accord EarthInfo v. Hydrosphere Resource Consultants, Inc.*, 900 P.3d 113, 118 (Colo. 1995) (rescission of the parties' exchange in the form of restitution "seeks to prevent unjust enrichment of the defendant").

## I.  LEGAL STANDARD

"A plaintiff who has been fraudulently induced to enter a contract may either rescind the contract or affirm the contract and recover in tort for the damages caused by the fraudulent act." *W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44, 48 (Colo. 1993) (citing *Trimble v. City & Cnty. of Denver*, 697 P.2d 716, 723 (Colo. 1985)). When the victim of fraudulent inducement elects rescission, they are "limited in remedy to restoration of conditions existing before the agreement was made." *Trimble*, 697 P.2d at 724. Put differently, recission requires each party to "return the opposite party to the *status quo ante*, or the position in which he or she was in prior to entering the contract." *EarthInfo*, 900 P.2d at 118 (citations omitted).

In rescission, a return to the *status quo ante* entails that each party:

> (a) restores property received from the other, to the extent such restoration is feasible; (b) accounts for additional benefits obtained at the expense of the other as a result of the transaction and its subsequent avoidance, as necessary to prevent unjust enrichment; and (c) compensates the other for loss from related expenditure as justice may require.

Restatement (Third) of Restitution & Unjust Enrichment § 54(2) (Am. L. Inst. 2011).

"The rule of returning the parties to the *status quo ante* is equitable and it requires the use of practicality in the readjustment of the parties' rights." *EarthInfo*, 900 P.2d at 118 (citation omitted). "Since recission is an equitable remedy, it is within the trial court's sound discretion to determine the method for accomplishing a return to the status quo ante based upon the facts as determined by the trier of fact." *Id.* (citations omitted); *see Rice v. Hilty*, 559 P.2d 725, 727 (Colo. App. 1976) ("Equity may fashion a remedy to effect justice suitable to the circumstance of the case."). And in exercising its discretion, this

Court is guided by the ultimate principle that "one should not gain by one's own wrong." *EarthInfo*, 900 P.2d at 117 (citation omitted).

## II.  DISCUSSION

The Court has carefully reviewed the parties' closing briefs, the exhibits attached thereto, the record from the parties' trial conducted between October 23 through November 3, 2023, the record from the parties' recission hearing held on November 17, 2023, the entire case file, and the relevant case law. In light of these authorities, the Court denies Open's Rule 52(c) motion. The Court then considers each of the City's five categories of requested expenses, as well as the City's request for pre-judgment interest.

### A.  Open's Motion for Judgment under Rule 52(c)

Open first moves for judgment against the City—purportedly pursuant to Federal Rule of Civil Procedure 52(c)—on two grounds: (i) the City waived its right to elect recission as a remedy in this case, and (ii) there is no evidence to support a judgment of recission against Open Investments. ECF No. 314 at 2–8.

However, as the City correctly observes, *see* ECF No. 320 at 3, the procedures outlined in Rule 52(c) are reserved for nonjury trials. *Goodwin v. Smith Chambers*, No. 21-cv-3421-WJM-STV, 2024 WL 517865, at *14 (D. Colo. Feb. 9, 2024) ("If a party has been fully heard on an issue during the nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party.") (quoting Fed. R. Civ. P. 52(c)). Here, the action was tried to a jury—including Open's affirmative defense of waiver. *See* ECF No. 309 at 152:14–22, 155:8–156:5. Following the jury's fraudulent inducement verdict in the City's favor and the City's subsequent election to rescind the

4

Agreements, the Court held a hearing at which the *only* issue before the Court was proper restitution amounts in recission. *Id.* at 154:12–155:6; *see generally* ECF No. 301. As such, Open's post-verdict challenges to its liability to the City are more appropriately brought under Rule 50(b).

Despite this, in the hopes of obviating the need to address these matters in the future, the Court addresses each of Open's arguments in turn.

### 1. Waiver of the right to rescind

Open first argues that no restitution amounts in recission are owed to the City because, notwithstanding the jury's clear verdict that the City did not waive its fraudulent inducement claim, the City nonetheless waived its right to rescind the Agreements. *See* ECF No. 314 at 2.

In making this argument, Open suggests that waiver of *fraudulent inducement* (as a claim) and waiver of *recission* (as a remedy) are governed by different tests, and while fraudulent inducement waiver was presented to the jury, recission waiver was reserved to the Court as an equitable matter and must be decided now.[4] Indeed, according to

---

[4] Interestingly, though, Open's arguments throughout this case have not always maintained this purported "fraudulent inducement waiver" and "recission waiver" distinction. At the summary judgment stage, for instance, Open argued that the City had *waived its fraudulent inducement claim.* ECF No. 125 at 27–30. But later in its briefing on election of remedies, Open claimed that it had earlier argued at the summary judgment stage that the City had "*waived recission* by electing to affirm the contract." ECF No. 232 at 3 (citing ECF No. 125 at 27–30) (emphasis added).

Similarly, Open's election briefing claimed that "[i]n response to the City's claims, Open pleaded the affirmative defense of waiver." ECF No. 232 at 3. But if, as Open maintains, waiver of fraudulent inducement (as a claim) and waiver of recission (as a remedy) constitute separate defenses, it would appear that Open specifically pleaded the former as an affirmative defense, but never the latter. *See* ECF No. 13 at 14 ("The City's *claims* are barred by the doctrines of waiver and estoppel.") (emphasis added); ECF No. 194 at 18 (same).

Closely related, although the Court clarified at trial that all waiver-related defenses would be encompassed in a single instruction (i.e., the COLJI pattern instruction), *see* ECF No. 309 at 155:8–156:5, Open did not

Open, it is legally possible that, "irrespective of whether the plaintiff waived the fraud claim, the remedy of recission, if elected, might still be waived." ECF No. 314 at 3.

For this proposition, Open points to semantic differences between two Colorado cases purportedly demonstrating that fraudulent inducement waiver and recission waiver involve separate analyses. *See* ECF No. 314 at 3. In *Gladden v. Guyer*, the Colorado Supreme Court stated:

> The duty of rescinding arises immediately upon acquiring knowledge of the substantial and material facts constituting the fraud. *It is not requisite that the defrauded party shall be acquainted with all the evidence constituting the fraud before the duty to act by way of rescission arises.* When he has evidence sufficient to reasonably actuate him to rescind the contract . . . , no subsequent discovery of cumulative evidence can operate to execute waiver of the fraud if one has in the meantime occurred, or to revise a once lost right of rescission.

426 P.2d 953, 956 (Colo. 1967) (emphasis added) (quoting *Richardson v. Lowe*, 149 F. 625, 631 (8th Cir. 1906) (internal citations omitted)).

By way of comparison, in *Elk River Associates v. Huskin*, the Colorado Court of Appeals stated: "To sustain the defense of ratification and waiver, it must appear that the defrauded party, *with full knowledge of the truth respecting the false representations,* elected to continue to carry out the agreement. This determination involves questions of

---

object to the unified waiver instruction at the parties' charging conference, *see* ECF No. 312 at 6:24–7:13. Nor did it propose any additional or different instructions for "recission waiver" in its "tendered and rejected" instructions. *See* ECF Nos. 284, 289, 290, 294.

Based on the foregoing, it seems that even Open has conflated these "two" waiver standards on numerous occasions.

Att.12

fact, particularly the fact of intent." 691 P.2d 1148, 1153 (Colo. App. 1984) (emphasis added).

Based on the above principles, Open argues that *Gladden* and *Elk River* apply two different waiver tests—i.e., fraudulent inducement waiver requires "full knowledge of the truth" regarding the fraud, whereas recission waiver requires only "knowledge of the substantial and material facts constituting the fraud." ECF No. 314 at 3. Open then argues that *Gladden*'s purported "recission waiver" test is for the Court to apply, and further suggests that, under *Gladden*, the City's duty to rescind is tied to a lower threshold—i.e., its discovery of problems with Open's software, rather than its discovery that Open's defective software was a product of its fraud. *Id.* at 3–5.

The trouble for Open, however, is that Colorado courts do not treat fraudulent inducement waiver and recission waiver as separate claims, governed by different tests, and decided by different factfinders. Indeed, courts in this district have treated the language in *Gladden* and *Elk River* as consistent, if not wholly equivalent. *See, e.g.*, *In re Mascio*, 454 B.R. 146, 151 (D. Colo. 2011) ("To sustain the defense [of waiver], 'it must appear that the defrauded party, with *full knowledge* of the truth respecting the false representations, elected to continue to carry out the agreement.' *Elk River Assocs. v. Huskin,* 691 P.2d 1148, 1154 (Colo.App.1984) (emphasis added). Full knowledge entails 'knowledge of the substantial and material facts constituting the fraud.' *Gladden v. Guyer,* 162 Colo. 451, 426 P.2d 953, 955 (1967).").

At bottom, fraudulent inducement waiver and recission waiver comprise *a single analysis*—under Colorado law, a party's "right to rescind and sue [is] waived" where "the

7

defrauded party, with full knowledge, intentionally condoned the fraud," and "[w]hether fraud has been waived involves questions of fact, particularly the fact of intent," which are "properly for the jury." *Bankers Trust Co. v. Int'l Trust Co.*, 113 P.2d 656, 664 (Colo. 1941). In this case, this exact standard for deciding the question of waiver was presented to the jury in a single instruction, *see* ECF No. 285 at 24 (Instruction No. 23), without objection from either party, *see* ECF No. 312 at 6:24–7:13, and the jury decided the waiver question in the City's favor,[5] *see* ECF No. 296. The Court therefore sees no reason to disturb the jury's clear verdict on the waiver issue by passing separately upon the City's right to rescind.

Accordingly, Open's motion as to this "recission waiver" issue is denied.

### 2. Recission against Open Investments

Next, Open argues that the City failed to adduce evidence to support judgment in recission against Open Investments. *See* ECF No. 314 at 6–8. According to Open, the evidence at trial established that Open Investments' sole link to this case was as a contractual guarantor for Open International, and that Open Investments was uninvolved in the fraudulent conduct at issue. *See* Tr. Ex. 1 at 4 (setting forth Open Investments' "unconditional[] guarantee [of] the performance of Open International of all obligations set forth in [the] MPSA and Software License Agreement"); ECF No. 305 at 15:17–16:10; ECF No. 311 at 67:22–68:7; Tr. Ex. 66 at 1 (accusing only "Open International LLC" of

---

[5] Indeed, as the City correctly observes, "[a]ll of the purported facts relied on in Open's [m]otion to assert a waiver of recission are the *same facts* that the jury considered when denying Open's affirmative defense of waiver." ECF No. 321 at 4 (citing ECF No. 314 at 2–4) (emphasis in original). And for this reason, to the extent that Open argues that the City failed to adduce sufficient facts at trial showing that it sought to rescind promptly, the Court reserves its analysis on this issue for Open's Rule 50(b) motion.

Att.14

breach and fraud). Open further observes that the RFP Response underlying the City's fraudulent inducement claim was submitted by Open International, *see* Tr. Ex. 5, all payments under the now-rescinded Agreements were made to Open International, *see* Tr. Ex. 522, and Open Investments never received any payment or benefit from the City that would be returnable as restitution. As such, Open contends, now that the City has elected to rescind the Agreements, Open Investments' liability in this case—arising solely in contract—has effectively dissipated. *See* ECF No. 314 at 7–8.

For substantially the reasons outlined by the City in its response to Open's motion, the Court agrees that this argument disclaiming any liability of Open Investments comes far too late. *See* ECF No. 320 at 7–11. If, as Open claims, the City failed to adduce any evidence of Open Investments' liability for fraudulent inducement independent of its liability under the Agreements, Open never once raised this issue at trial or in its oral Rule 50(a) arguments. *See* ECF No. 309 at 142:10–1448:23; ECF No. 312 at 49:5–52:19, 55:8–56:23. Nor did Open raise this issue in its written Rule 50(a) motion memorializing its earlier oral argument.[6] *See* ECF No. 282. Similarly, Open failed to separate liability for each entity, and in fact affirmatively represented itself "collectively" or "together" as "Open," throughout the entirety of the case—including in its notice of removal, answer,

---

[6] Indeed, Open only advanced a full-throated argument on this issue *for the first time* in its written Rule 50(b) motion. *See* ECF No. 302 at 6–8. Given that final judgment has yet to enter in this case, however, the Court defers consideration of this argument, except to note that if Open maintains its argument that recission liability does not lie against Open Investments, this argument is probably already waived as unraised at the Rule 50(a) stage. *See Garcia v. Aerotherm Corp.*, No. 98-2214, 1999 WL 124486, at *3 (10th Cir. Dec. 21, 1999) ("[I]ssues not raised in an initial Rule 50(a) motion for judgment as a matter of law may not be asserted in a post-judgment motion for judgment as a matter of law under Rule 50(b)."); *Brillhart v. Philips Elecs. N. Am. Corp.*, 179 F.3d 1271, 1275 (10th Cir. 1999) ("Failure to so move precludes a post-trial motion . . . for judgment as a matter of law . . . .").

partial motion for summary judgment, amended answer, final pretrial order, motion in limine, trial brief, and written Rule 50(a) motion. *See generally* ECF Nos. 1, 13, 125, 194, 230, 240, 256, 282.

Perhaps most significantly, Open did not object to language included in the jury instructions and verdict form applying liability for fraudulent inducement jointly to the entities.[7] *See* ECF No. 285; ECF No. 296; ECF No. 312 at 3:3–32:20. As such, there is now a fraudulent inducement verdict against *both* Open International and Open Investments, and the Court is not at leisure to "undo" the verdict against one of them, or to order restitution from only one of them. *See Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 408 F. App'x 162, 172 (10th Cir. 2011) ("[A] party waives its right to present a legal argument on appeal by failing to object to [the] jury instruction[s] which authorized the verdict.") (citations omitted); *see also Glass Containers Corp. v. Miller Brewing Co.*, 643 F.2d 308, 312 (5th Cir. 1981) ("[A] litigant cannot strategically lie behind the log until after the trial and the receipt of evidence, argument, and charge to the jury before raising an issue not found in the pleadings nor included in the pre-trial order and them raise it when it is too late for his opponent to do anything about it."). Simply put, Open's request for this Court to reconsider the evidence and make a separate determination of Open Investments' liability when it was not an issue at trial is inappropriate.

As such, Open's motion seeking to avoid Open Investments' liability in recission is denied.

---

[7] In fact, Open agreed to the City's request that element 5 of the elemental instruction on fraudulent inducement be clarified to state "Open's representation" rather than just "the representation." *See* ECF No. 312 at 5:4–10; ECF No. 285 at 16 (Instruction No. 15).

**B.  The City's Restitution Requests**

Having determined that judgment in Open's favor is unwarranted, the Court next considers each of the City's requested restitutionary amounts. As set forth below, the Court, in its equitable power and broad discretion, awards judgment in the City's favor on its project costs, third-party consulting costs, and labor costs. The Court declines, however, to grant the City's requests to recover its lost net revenue or attorney's fees.

*1.  Amounts paid under the Agreements*

First, the City seeks to recover $8,756,659 in amounts it paid to Open for the billing software contracted for in the Agreements.[8] *See* ECF No. 315 at 4–6; *see also* ECF No. 315-2 at 3; ECF No. 301 at 17:20–20:7 (testimony of the City's damages expert, Ronald Seigneur). The Court agrees that the City is entitled to recover this amount in restitution.

Put simply, the relevant law is well settled that under the City's elected remedy of recission, Open should return any project costs the City paid pursuant to the Agreements. *See Aaberg v. H.A. Harman Co.*, 358 P.2d 601, 603 (Colo. 1960) ("Upon discovery of the fraud, plaintiff had the right . . . to rescind the contract and sue for the return of the money paid."); *Rice*, 559 P.2d at 727 (in recission, awarding restitution in the form of "whatever consideration [defendants] received under the contract"); *In re Sun*, 535 B.R. 358, 370 (10th Cir. Bankr. App. Panel 2015) (in recission, awarding restitution in the form of amounts paid under the parties' contract plus interest); *see also* Restatement (Third) of Restitution & Unjust Enrichment § 54(1) (Am. L. Inst. 2011) ("A person who has

---

[8] In particular, the City specifies that beginning in September 2018, the City paid Open $8,756,659 over the course of 33 months pursuant to the Agreements. *See* Tr. Ex. 743 at Sch. H.

transferred money or other property is entitled to recover it by recission and restitution if the transaction is invalid or subject to avoidance . . . ."); *id.*, § 13(1) ("A transfer induced by fraud or material misrepresentation is subject to recission and restitution.").

Notwithstanding this clear authority, Open argues that no restitution in the form of project costs should be awarded, because the $8,756,659 in amounts the City paid under the Agreements is fully offset by the value of the services Open contributed to the project at the City's behest, which were purportedly worth more than $20 million.[9] ECF No. 314 at 8–10, 12–14; ECF No. 321 at 7–9. More specifically, Open argues that regardless of the jury's finding of Open's liability for fraudulent inducement, recission is properly effectuated by "restitution on both sides." ECF No. 314 at 9 (quoting *EarthInfo*, 900 P.2d at 118). In turn, when the consideration given by Open is properly accounted for— "mak[ing] 'some apportionment' between the amounts obtained through misconduct and the amounts the defendant rightly earned independent of its misconduct," ECF No. 314 at 10 (quoting *EarthInfo*, 900 P.2d at 120)—any award of the City's project costs would be completely offset by the value of services performed by Open, thereby rendering restitution in the form of project costs impermissible.

In advancing this argument, Open relies heavily on *EarthInfo* for the proposition that even where a defendant's wrongdoing warrants recission, a trial court must still credit

---

[9] On this point, Open's damages expert, Peter Schulman, testified that during the three years that Open worked on the project, it provided 101,880 hours of implementation services and 22,105 hours of support services, which were worth $117 per hour, plus 29,353 hours of product and technology development services, which were worth $116 per hour—all for a total of $17,911,166 of services. *See* ECF No. 301 at 72:17–75:7, 80:10–24, 81:7–82:20. Furthermore, Mr. Schulman testified that during the same period, Open provided the services of its subcontractor, Milestone, for which Open paid $2,682,785. *See id.* at 80:21– 81:6, 81:25–82:6, 82:21–83:6.

the defendant for having "materially contributed effort and investment" into the parties' contractual relationship. *See EarthInfo*, 900 P.2d at 120–21; *see id.* at 120 ("Even the willful wrongdoer should not be made to give up that which is his own; the principle is disgorgement, not plunder.") (citation omitted). Open's reliance on *EarthInfo* in this regard, however, is misplaced. In that case, recission was sought based on a party's breach of the contractual obligation to make payments, *not* fraud inducing a party's entry into the contract in the first instance. *See EarthInfo*, 900 P.2d at 115–17. This distinction matters—*EarthInfo* instructs that recission is both equitable in nature and dependent on the defendant's level of wrongdoing. *See id.* at 119. And while "a 'mere' breach of contract is not a 'wrong'" that strips a defendant of his entitlement to restitution, more "intentional or substantial" wrongdoing may change the equitable calculus with respect to the defendant's retention of benefits under the contract. *Id.* at 117, 119 (citations omitted); *see id.* at 117 ("It is a principle of the law of restitution that one should not gain by one's own wrong.") (citation omitted).

In this case, Open was found to have committed a higher level of wrongdoing than "a mere breach of contract"—indeed, a jury determined that Open fraudulently induced the City into executing the contract. In that light, Open's request for setoff of amounts it earned under a fraudulently procured contract would seem to offend basic principles of equity—i.e., if granted, Open's requested setoff would "allow it to commit fraud, keep and use [its] software, and keep the nearly $9 million it was paid by the City because it 'earned these amounts not by fraud but by work the City requested and accepted.'" ECF No. 326 at 3 (quoting ECF No. 321 at 8). As such, the Court will not credit Open for the work it did

13

after its fraud.[10] *See Arguelles v. Ridgeway*, 827 P.2d 553, 557 (Colo. App. 1991) ("A party who seeks equity must do equity, and a party may not take advantage of his or her own wrongful acts. A court will not lend its equitable aid to a party who is guilty of fraudulent or unconscionable conduct . . . .") (citations omitted); *accord* Restatement (Third) of Restitution & Unjust Enrichment § 54(3)(b) (Am. L. Inst. 2011) ("Recission is limited to cases in which counter-restitution by the claimant will restore the defendant to the status quo ante, unless the fault of the defendant . . . makes it equitable that the defendant bear any uncompensated loss."); *id.*, § 54(4)(a) ("If the claimant seeks to reverse a transfer induced by fraud or other conscious wrongdoing, the limitation described in subsection (3) is liberally construed in favor of the claimant."); *see also PHL Variable Ins. Co. v. P. Bowie 2008 Revocable Trust*, 889 F. Supp. 2d 275, 281 (D.R.I. 2012) (the law does not "allow an entity to commit an intentional and calculated fraud . . . and walk away unscathed while the innocent party bears the financial burden of the fraud"); *McKay v. Weager*, 134 N.Y.S. 66, 69 (N.Y. 1911) (a claim cannot be used as a setoff where the transaction out of which it arose was fraudulent); *Duncan v. Dazey*, 318 Ill. 500, 505 (Ill. 1925) ("Equity will not permit a person to derive any benefit from a fraud perpetrated by him.").

In sum, the Court awards judgment in the City's favor in the amount of $8,756,659 for project costs it paid to Open during the course of the parties' Agreements. The Court

---

[10] This is especially true in light of testimony at trial suggesting that (i) the City *never* received a fully functional version of Open's software, but Open continued to develop it with the City's assistance, and (ii) after the software was returned to Open's control, Open proceeded to profit from it in connection with other North American municipal projects. *See* ECF No. 311 at 58:19–21; *see also* ECF No. 320 at 13.

further declines to award Open any credit or setoff against this amount, as Open will not be compensated for its fraud.

### 2. Amounts paid to third-party consultants

Second, the City seeks to recover $456,024 in amounts it paid to third-party consultants, TMG Consulting and Vanir Construction Management.[11] *See* ECF No. 315 at 6–7; *see also* ECF No. 315-2 at 3; ECF No. 301 at 6:24–10:25 (Seigneur testimony). The City contends that it is entitled to recover these amounts because, "but for Open's fraud, it would not have needed to hire or pay TMG or Vanir to provide consulting or project management services on the Project with Open." ECF No. 315 at 6. In response, Open argues that the amounts the City paid to its third-party consultants (as well as the amounts representing the City's own labor costs, discussed below) would aim to reimburse the City for its expenditures actually made in performance of the Agreements and, as such, are reliance damages that are unavailable in the recission context. ECF No. 315 at 3 (citing *Spring Creek Exploration & Prod. Co., LLC v. Hess Bakken Invs. II, LLC*, 887 F.3d 1003, 1026 (10th Cir. 2018)).

Broadly speaking, a claimant who has elected recission is "limited in remedy to restoration of conditions existing before the agreement was made"—i.e., the simple return of any consideration each party gave pursuant to the contract. *Trimble*, 697 P.2d at 724; *see EarthInfo*, 900 P.2d at 118 (restitution "differs in principle from damages, which measure the remedy by the plaintiff's loss and seek to provide compensation for that

---

[11] More specifically, the City paid Vanir $169,917 in 2020 and an additional $86,810 in 2021 for project management services. *See* Tr. Ex. 743 at Sch. K3. The City also paid TMG a total of $199,297 for consulting services on the project in 2021. *See* Tr. Ex. 349 (yellow and green highlighting).

loss"). However, recission may still leave the claimant with losses from related expenditures—separate from any consideration given under the contract—that were made in reliance on the contract. While these reliance damages constitute a remedy "different in kind from recission and restitution," they are "not necessarily inconsistent when the claimant's basic entitlement is to be restored to the status quo ante." Restatement (Third) of Restitution & Unjust Enrichment § 54 cmt. i (Am. L. Inst. 2011). Indeed, "[d]amages measured by the claimant's expenditure can be included in the accounting that accompanies recission, in order to do complete justice in a single proceeding." *Id.*; *see Trimble*, 697 P.2d at 724 ("The defrauded party may recover such damages as are a natural and proximate consequence of the fraud.").

Here, the City's third-party consultant costs were directly related to its performance under the Agreements—performance which would not have occurred at all, but for the City having been induced by fraud into entering the Agreements. In that light, the City's request to recover these costs appears to the Court to be eminently reasonable. *See Rice*, 38 P.2d at 340–41 (directing the lower court to consider "the reasonable value of services" in determining recission amounts due based on fraud); *Elliott v. Aspen Brokers, Ltd.*, 811 F. Supp. 586, 591 (D. Colo. 1993) (while a claimant in recission may not recover expectancy or "benefit-of-the-bargain" damages, the claimant's out-of-pocket expenses nonetheless remain available); *see also* Restatement (Third) of Restitution & Unjust Enrichment § 54(2)(c) (Am. L. Inst. 2011) (in recission, each party "compensates the other for loss from related expenditure as justice may require"); *Robinson v. Katz*, 610 P.2d 201, 207 (N.M. Ct. App. 1980) (explaining that restitutionary damages are "permissible to

Att.22

restore the plaintiff to his former position when recission is granted because of fraud"); *Gearhart v. Goehner*, 701 P.2d 461, 467 (Or. Ct. App. 1985) ("Where rescission is based on fraud, and where the innocent party, before discovering the fraud, has made reasonable expenditures in reliance on the bargain, those expenses may be recovered upon rescission.") (citation omitted).

Accordingly, the Court awards judgment in the City's favor in the amount of $456,024 for its payments to TMG and Vanir during the course of the parties' Agreements.

### 3. Labor costs

Third, the City seeks to recover $4,376,969 in services rendered by City personnel in connection with the project with Open. *See* ECF No. 315 at 7–9; *see also* ECF No. 315-2 at 3; ECF No. 301 at 20:8–24:9 (Seigneur testimony). As the City contends, it "was required to incur significant amount[s] [in] resources and labor costs in order to implement the Project that it would not have incurred but for Open's fraudulent conduct," and because Open's software did not function as promised, the City's employees had to spend extra time "testing, improving, and effectively developing Open's product."[12] ECF No. 315 at 8. Once more, Open disputes the City's entitlement to these amounts, arguing that reliance damages are impermissible in recission. ECF No. 321 at 3.

For the reasons discussed above in connection with the City's request to recover its third-party consulting expenses, the Court agrees that the City's request to recover its

---

[12] In particular, the City explains that, per the parties' Agreements, it was required to staff a certain number of full-time equivalents (FTEs) on the project, and that from August 15, 2018, to January 15, 2021, the City employed an average of 12 business FTEs at $80/hour and 6 IT FTEs at $100/hour, each for an estimated five hours per day. *See* Tr. Ex. 743 at Sch. M; ECF No. 307 at 130:13–131:6; ECF No. 309 at 213:11–14.

Att.23

own labor costs is similarly reasonable. *See Rice*, 38 P.2d at 340–41; *Elliott*, 811 F. Supp. 586 at 591; *see also* Restatement (Third) of Restitution & Unjust Enrichment § 54(2)(c) (Am. L. Inst. 2011). Thus, the Court awards judgment in the City's favor in the amount of $4,376,969 in labor costs it incurred during the course of the parties' Agreements.

### 4. Lost net revenue

Fourth, the City seeks to recover $3,389,467 in revenue lost from the project's delays and the City's resultant loss of customers. *See* ECF No. 315 at 9–10; *see also* ECF No. 315-2 at 3; ECF No. 301 at 11:4–17:19 (Seigneur testimony). Here, the City argues that "[h]ad Open not defrauded the City, the City could and would have chosen a different vendor . . . , the Project would have proceeded on time, the City would not have experienced the delayed customer growth it did with Open, and the City would not have lost customer revenue."[13] ECF No. 315 at 9. In response, the City contends that the lost profits the City had anticipated earning from future subscribers amount to expectation damages and, as such, are unavailable in recission. ECF No. 321 at 3–4.

Here, the Court finds that Open has the better of this argument. Unlike the City's requests to recover amounts it paid for labor and third-party consultants—expenditures it had actually made, and reimbursement for which would aid in its return to the *status quo ante*—projected revenues represent benefits the City would have realized *after* the

---

[13] More specifically, the City contends that its "ability to add broadband customers was constrained because using Open's poorly functioning software required manual processes for tasks that should have been automated," and that "[t]he inoperability of Open's system prevented the City from introducing certain broadband products, which further resulted in lost business opportunities for the City." ECF No. 315 at 9. Mr. Seigneur estimated that the City likely lost 6,632 customers, each of whom was expected to bring annual revenue of $1,081 to the City as of July 2022. In total, Mr. Seigneur calculated that the City would lose $3,389,467 in revenue through 2026. *See* Tr. Ex. 743 at 14–16; *id.* at Sch. F1.

Agreements' successful completion, not *before* the Agreements were ever executed. Simply put, these expectancy damages are not recoverable given the City's election to rescind. *See In re Sun*, 535 B.R. at 370 n.33 (if the plaintiff elects recission of the contract, rather than ratification, benefit-of-the-bargain damages are not available); *accord Rice*, 559 P.2d at 727; *Elliott*, 811 F. Supp. at 591; *see also Holscher v. Ferry*, 280 P.2d 655, 658 (Colo. 1955) ("It is a well-settled rule of law that, when a party has an election to rescind an entire contract, he must rescind it wholly or in no part. He cannot consider it void for one purpose, and at the same time in force for the purposes of recovering damages.").

As such, the Court declines to award the City any amounts in connection with its lost net revenue.

### 5. Attorney's fees and costs

Fifth, the City seeks to recover attorney's fees and costs it incurred in pursuing this action against Open. *See* ECF No. 315 at 10–13. Under the circumstances, the Court is not persuaded that an award of attorney's fees is permissible, let alone warranted.

"Under the bedrock principle known as the 'American Rule,' each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) (internal citations and quotation marks omitted). Notwithstanding the American Rule, the City points to the U.S. Supreme Court's purported recognition that federal courts sitting in equity possess the power to award attorney's fees in "exceptional cases and for dominating reasons of justice." *See* ECF No. 315 at 10–11 (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 167 (1939)); *see also*

*Sprague*, 307 U.S. at 164 (explaining that awards of attorney's fees and costs in appropriate situations, aside from those costs contemplated by statute, "is part of the historic equity jurisdiction of the federal courts").

By contrast, Open argues that the City's request for attorney's fees is premised on a misreading of *Sprague*, which more narrowly permitted "the trustee of a fund or other property" to recover attorney's fees in equity "from the fund or property itself or directly from the other parties enjoying the benefit." *See* ECF No. 321 at 10–11 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257–58 (1975) (construing *Sprague*)). According to Open, the trustee exception identified in *Sprague* is one of the few "judicially fashioned exceptions to the general rule against allowing substantial attorney's fees," and it does not extend to any and all actions in equity.[14] *Id.* at 10 (quoting *Alyeska Pipeline*, 421 U.S. at 259–60); *see Alyeska Pipeline*, 421 U.S. at 260 (Congress has not "extended roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted").

A careful reading of the Supreme Court's jurisprudence in this area would tend to support Open's position. Although the Court presently sits in equity to determine restitution amounts in a case in which Open was found to have acted fraudulently, the Court is "not free to fashion drastic new rules with respect to the allowance of attorney's fees to the prevailing party in federal litigation." *Alyeska Pipeline*, 421 U.S. at 269. Aside

---

[14] Other "judicially fashioned exceptions" to the American Rule recognized by the Supreme Court have included assessment of attorney's fees "for the willful disobedience of a court order . . . as part of the fine to be levied on the defendant," or "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline*, 421 U.S. at 258–59 (collecting cases). The City does not invoke these exceptions here.

Att.26

from the few judicially recognized exceptions to the American Rule noted above, Congress has "reserved to itself" the power "to carve out specific exceptions to [the] general rule that federal courts cannot award attorney's fees." *Id.* Thus, absent a specific statute or a valid contractual provision authorizing an award of attorney's fees, the Court declines to grant any.[15] *Marx*, 568 U.S. at 382.

For these reasons, the Court declines to award the City its attorney's fees and costs in connection with this action.

### 6. Pre-judgment interest

Finally, the City seeks pre-judgment interest (PJI) on the restitution categories identified above, to be calculated on a compound annual basis from April 15, 2023, through the date of final judgment. *See* ECF No. 315-2; *see also* ECF No. 315 at 5–6 (PJI for project costs), 7 (PJI for third-party consultant costs), 8–9 (PJI for labor costs), 10 (PJI for lost net revenue).[16]

An award of pre-judgment interest "rests firmly within the sound discretion of the trial court." *E.E.O.C. v. W. Trading Co., Inc.*, 291 F.R.D. 615, 621 (D. Colo. 2013) (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1287 (10th Cir. 2002)). "A two-step analysis governs the determination of such an award." *Id.* (quoting *Caldwell*, 287 F.3d at

---

[15] Even assuming that attorney's fees were authorized, the Court sees little reason to award them as a matter of equity. In particular, the City unnecessarily prolonged this litigation by refusing to elect among its available remedies until forced to do so by the Court. Had the City chosen either to rescind or affirm the Agreements much earlier in the case, the parties' trial likely would have been half as long, and the issues half as complex. The Court is not inclined to reward the City's counsel for this strategery. *See Kline Hotel Partners v. Aircoa Equity Interests, Inc.*, 729 F. Supp. 740, 743 (D. Colo. 1990).

[16] As discussed above, the Court in its discretion has declined to award any amounts in connection with the City's lost net revenue.

1286). In exercising its discretion, "[t]he district court must first determine whether the award of pre-judgment interest will serve to compensate the injured party. Second, even if the award of pre-judgment interest is compensatory in nature, the district court must still determine whether the equities would preclude the award of pre-judgment interest." *Id.*

Here, the Court finds that awarding PJI to the City would be compensatory rather than punitive. As noted by the Tenth Circuit in *Caldwell*, "the rule in this circuit is that pre-judgment interest is generally available to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment." *Caldwell*, 287 F.3d at 1286 (citation omitted). Awarding PJI on the City's project costs, third-party consulting costs, and labor costs would simply put the City in the position it would have been but for Open's fraudulent conduct; as such, PJI in this case would serve to compensate the City rather than punish Open.

Similarly, the Court finds that awarding PJI to the City would not be inequitable. The Tenth Circuit has held that "pre-judgment interest should normally be awarded on successful federal claims." *W. Trading Co.*, 291 F.R.D. at 621 (citations omitted). Nothing in this case removes it from the norm; therefore, the Court concludes that the equities weigh in favor of granting PJI in this case.

Therefore, the Court awards the City PJI for its project costs, third-party consulting costs, and labor costs discussed above.

### III.  CONCLUSION

Consistent with the foregoing analysis, the Court ORDERS as follows:

(1) Defendants' Motion for Judgment Under Rule 52(c), ECF No. 314, is DENIED;

Att.28

(2) The Clerk of Court is directed to enter final judgment in favor of the City in the following amounts, as well as post-judgment interest at the rate set by 28 U.S.C. § 1961:

    a.  $8,756,659 in project costs;

    b.  $456,024 in third-party consulting costs;

    c.  $4,376,969 in labor costs; and

(3) Within 10 days of this Order, the City shall file a supplement to Mr. Seigneur's pre-judgment interest calculations in ECF No. 315-2, setting forth the amounts of pre-judgment interest due on the City's project costs, third-party consulting costs, and labor costs from April 15, 2023, through the date of final judgment. The Court will enter a separate Order awarding these pre-judgment interest amounts accordingly.

DATED this 21st day of March 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

Att.29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02063-CNS-SBP

CITY OF FORT COLLINS, a Colorado home rule municipality,

     Plaintiff,

v.

OPEN INTERNATIONAL, LLC, a Florida limited liability company and
OPEN INVESTMENTS, LLC, a Florida limited liability company,

     Defendants.

---

## FINAL JUDGMENT

---

     In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     This action was tried before a jury of eight duly sworn to try the issues herein with

United States District Judge Charlotte N. Sweeney presiding, and the jury has rendered

a verdict.  Pursuant to the jury verdict, orders issued during the trial, and the Order

entered on March 21, 2024, [ECF No. 327] it is

     ORDERED that judgment is entered in favor of the plaintiff, City of Fort Collins,

and against the defendants, Open International, LLC and Open Investments, LLC, as to

fraudulent inducement in the following amounts:

     a. $8,756,659 in project costs;

     b. $456,024 in third-party consulting costs;

     c. $4,376,969 in labor costs.

     It is

FURTHER ORDERED that post-judgment interest shall accrue in accordance

with 28 U.S.C. § 1961 at a rate of 5.02% from the date of entry of this Judgment.  It is

FURTHER ORDERED that the plaintiff is awarded its costs, to be taxed by the

Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  It is

FURTHER ORDERED that this case is closed.


Dated: March 26, 2024.


FOR THE COURT:

Jeffrey P. Colwell, Clerk


By s/ J. Dynes_____
   J. Dynes, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02063-CNS-SBP

CITY OF FORT COLLINS, a Colorado home rule municipality,

      Plaintiff,

v.

OPEN INTERNATIONAL, LLC, a Florida limited liability company and
OPEN INVESTMENTS, LLC, a Florida limited liability company,

      Defendants.

---

## AMENDED FINAL JUDGMENT

---

      In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

      This action was tried before a jury of eight duly sworn to try the issues herein with

United States District Judge Charlotte N. Sweeney presiding, and the jury has rendered

a verdict.  Pursuant to the jury verdict, orders issued during the trial, and the Orders

entered on March 21, 2024, and March 28, 204, [ECF Nos. 327 and 331] it is

      ORDERED that judgment is entered in favor of the plaintiff, City of Fort Collins,

and against the defendants, Open International, LLC and Open Investments, LLC, as to

fraudulent inducement in the following amounts which include pre-judgment interest:

      a. $12,245,881 in project costs;

      b. $578,280 in third-party consulting costs;

      c. $7,067,286 in labor costs.

      It is

FURTHER ORDERED that post-judgment interest shall accrue in accordance with 28 U.S.C. § 1961 at a rate of 5.02% from March 26, 2024, the date of the Final Judgment [ECF No. 329].  It is

FURTHER ORDERED that the plaintiff is awarded its costs, to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated: March 28, 2024.

FOR THE COURT:

Jeffrey P. Colwell, Clerk

By s/ J. Dynes_____
    J. Dynes, Deputy Clerk

2

Att.33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE CHARLOTTE N. SWEENEY**

| | | | |
|---|---|---|---|
| Civil Action: | 21-cv-02063-CNS-SBP | Date: | August 15, 2024 |
| Courtroom Deputy: | Julie Dynes | Court Reporter: | Sarah Mitchell |

| *Parties* | *Counsel* |
|---|---|
| CITY OF FORT COLLINS | *Case Collard* |
| | *John Duval* |
| | *Andrea Wechter* |
| **Plaintiff/Counter Defendant** | |
| **v.** | |
| OPEN INTERNATIONAL LLC | *Laurie Daniel* |
| OPEN INVESTMENTS LLC | *Jeffrey Sandman* |
| | *Paul Swanson* |
| **Defendant/Counter Claimant** | |

**COURTROOM MINUTES**

**ORAL ARGUMENT**

**Court in Session:** 1:01 p.m.

Appearance of counsel. Also present at the plaintiff's table is City Attorney Carrie Daggett; also present at defense table is client representative William Corredor.

Argument as to [302] Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law given by Ms. Daniel, Ms. Wechter, and Mr. Collard.

As outlined on the record, it is

**ORDERED:   [302] Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law is DENIED.**

Argument as to [347] Defendants' Post-Trial Motions Pursuant to Rule 50(b), Rule 52, and Rule 59(e), and Rule 59(a) given by Ms. Daniel and Mr. Collard.

As outlined on the record, it is

**ORDERED:    [347] Defendants' Post-Trial Motions Pursuant to Rule 50(b), Rule 52(b),
Rule 59(e), and Rule 59(a) is DENIED.**

The Court will enter a text-only order fixing the original judgment amount, noting that the
amended judgment is correct.

Court in Recess: 2:31 p.m.            Hearing concluded            Total time in Court:  01:30

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3  Civil Action No. 21-cv-02063-CNS-SBP

4

5   CITY OF FORT COLLINS,

6       Plaintiff,

7       vs.

8   OPEN INTERNATIONAL, LLC and OPEN
    INVESTMENTS, LLC,
9
       Defendants.
10
   ---------------------------------------------------------------
11
              REPORTER'S TRANSCRIPT
12               Oral Argument

13  ---------------------------------------------------------------

14  Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
    United States District Court for the District of Colorado,
15   commencing on the 15th day of August, 2024, in Courtroom
      A-702, United States Courthouse, Denver, Colorado.
16
                APPEARANCES
17
   For the Plaintiff:
18  CASE L. COLLARD and ANDREA A. WECHTER, Dorsey & Whitney LLP,
    1400 Wewatta St., Ste. 400, Denver, CO 80202
19
   For the Defendants:
20  PAUL D. SWANSON, Holland & Hart LLP, 555 17th St., Ste. 3200,
    Denver, CO 80201
21
   LAURIE W. DANIEL and JEFFREY I. SANDMAN, Webb Daniel
22  Friedlander, LLP, 75 14th St. NE, Ste. 2450, Atlanta, GA 30309

23

24

25    Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
          Denver, CO 80294, 303-335-2108
       Proceedings reported by mechanical stenography;
        transcription produced via computer.

1    understanding that argument.  It doesn't make sense to me.  We

2    covered it in the brief, that if their position is that Open

3    Investments isn't liable, then you have to bring that up at

4    the liability stage.  It doesn't have anything to do with the

5    remedy that is chosen.

6          And then the final -- sorry -- I maybe said final

7    already -- I think that -- by the way, I think the failure to

8    make the distinction at the jury instruction and verdict form

9    phase, that's really the fatal blow right there is that they

10   didn't object to treating Open together there, so I think I've

11   covered the idea that I don't think Open Investments is an

12   innocent party.

13         But I think the last point is they seem to be

14   advocating for you to do some independent analysis at the

15   remedy stage, at the restitution stage as part of your

16   equitable analysis.  I think it's important that there's

17   probably an issue preclusion issue there where you cannot

18   contradict the jury's verdict as you handle the equitable

19   restitution phase of the case, because the jury has already

20   made this finding, so you can't make a contrary finding when

21   it's already been litigated in this case.  I think that that

22   would be issue preclusion.

23         Okay.  I think unless you have any questions, that's

24   all I have.

25         THE COURT:  I do not.  Thank you.

Sarah K. Mitchell, RPR, CRR

1          All right.  With respect to ECF 302, the Rule 50

2     renewed motion for judgment as a matter of law, I am denying

3     that motion largely for reasons that I've already put on the

4     record, and through our conversation here today there's been

5     supplemental reasons.  I'm just skimming through to see if

6     there's anything that I had not addressed that I should put

7     on.

8          I have addressed I think three other times the issue

9     of then existing facts and reasonable reliance, justifiable

10    reliance, the intention to induce.  I adopt and incorporate my

11    prior rulings at trial on those issues.  The economic loss

12    we've discussed significantly today, and for the reasons I've

13    put on the record, I find *Bermel* and *McWhinney* to be

14    dispositive, though I will note Ms. Wechter's cite to *Goodrich*

15    is also critically important given these were alternative

16    remedies, and if the tort claim went forward, the contract

17    claim wouldn't, and vice versa.  So I think that supplies an

18    additional reason why the economic loss rule could not

19    possibly bar the relief on the fraudulent inducement claim.

20         Waiver, I think that comes up again, and you all

21    didn't talk about it yet.  Are we doing that again in the part

22    of the next series?

23         MS. DANIEL:  Your Honor, whether we do it in the next

24    part or now, I do have one additional thing I would like to

25    say, and when you mentioned waiver, I'm not sure which --

1    which waiver.

2         THE COURT:  In 302 it's waiver of the claim.

3         MS. DANIEL:  Right.  And, of course, we, you know,

4    argued in our briefing there's a difference between waiver of

5    claim and waiver of remedies, so I did want to remind the

6    Court on that.  But there's one other thing that I think is

7    pertinent here maybe for me to mention now for the Court's

8    consideration, and that is on the question of fraud, Open

9    Investments, of course their financials were included.  They

10   were a guarantor.

11        They were a guarantor, and if the City had affirmed

12   the contract rather than rescind it, they would have been a

13   guarantor.  So that's a reason why there was no waiver until

14   -- no waiver at all, but it was when the City chose to rescind

15   rather than affirm the contract that it became obvious that

16   they needed to say, wait a minute, that's different.  So

17   that's all I wanted to say on that at this point.

18        THE COURT:  Well, let me proceed.  Let me address

19   this, and maybe we'll address it again, but I think the

20   subsequent waiver issue is about the rescission remedy.  So

21   let me just say because we didn't talk about it as part of 302

22   I've already -- we've already discussed whether the claim of

23   fraudulent inducement was waived by an untimely -- by

24   continuing the contract allegedly after they knew enough to

25   rescind.  I've already ruled on that as part of the prior

1    rulings on Rule 50s.

2          I would simply note that in reviewing that, the

3    record in preparation for today, I was reminded that the

4    evidence that came in at trial was somewhat different than on

5    summary judgment, and I think it supported my decision that

6    the claim had not been waived, and the jury's findings that it

7    had not been waived, more importantly, but there's no basis to

8    disturb the jury's finding because I would have reached the

9    exact same conclusion, and the extensive testimony about what

10   happened in that springtime period really solidified that in

11   my mind, that the summary judgment ruling was correct, and

12   then, of course, the jury found that.  So let me just note for

13   the record that I find the evidence was more substantial at

14   trial than on summary judgment with respect to that issue.

15         I find the latter two issues in 302 to be completely

16   moot.  They dealt with the contract claims.  The contract

17   claims are not at issue.  But to the extent you need a ruling,

18   that's denied on subsections 2 and 3 in ECF 302.

19         So with that, let's go to the next motion, which I

20   don't know -- I feel like I need an explanation, though

21   perhaps you feel I don't deserve one, but why are we making so

22   many Rule 50(b) motions?  I can't believe you actually wrote

23   in here you were renewing your Rule 50(a) and your 50(b) in

24   this document when you've already had four bites at the apple.

25   So this is -- I was surprised to read that.  Again, you don't

1   have to comment, but I felt the need to bring it up.

2          I would also note for the record in both of these

3   motions you completely violated my page limits which I allowed

4   simply because I prefer addressing things on the merits rather

5   than striking them.  If this was a pretrial motion, these all

6   would have been stricken.  But I just want to put that on the

7   record, because I really was dumbfounded that here we are

8   trying to do yet again a Rule 50.

9          MS. DANIEL:  Your Honor, first off, we appreciate

10  your accepting the page -- extra pages from both the City and

11  us.  I think it was kind of both sides that did that.  I was a

12  little wondering about it when I was looking at standing

13  orders and such, but it seemed to me that you had been

14  accepting it, so I thank you for that.

15         As far as the Rule 50 renewals, appellate practice

16  can be a scary thing, and we've heard the word waiver a lot

17  today, and there's nothing scarier than being told that you

18  waived it because you hadn't made the right Rule 50(b) motion,

19  and so it was a little -- the explanation that I can give you

20  is Rule 52(b) has a quirky piece to it that says if there's an

21  issue that the jury has not decided, that you need to go ahead

22  and make your motion within 28 days of the verdict.  And

23  that's -- the question here was the breach of contract claim

24  was there at the trial, but the jury did not reach it, so I

25  think that's what prompted that early -- the earliest

 1  Rule 50(b) motion, which normally you wouldn't see.  But then

 2  out of an abundance of caution, because 50(b) does speak in

 3  terms of filing motion after the judgment, that's the

 4  explanation I can give you for additional Rule 50(b) --

 5          THE COURT:  Well, all right.  Suffice to say, I do

 6  not want to address any of the Rule 50(a) or (b) issues as

 7  part of the argument on ECF 353.  We've covered those ad

 8  nauseam.  So with that kind of framework for you, you may

 9  proceed to argue the other issues in your motion.  So I would

10  direct you to the more pertinent issues, and, again, you may

11  pick and choose what you think you need to supplement.

12  Obviously, I've read the briefs and reviewed the record, so

13  feel free to focus on those you think warrant additional

14  explanation.

15          MS. DANIEL:  And really, Your Honor, I think they are

16  briefed, and I don't want to take up your time unless you have

17  specific questions.  The most important thing I think, though,

18  is the question on prejudgment interest, for example, and when

19  that starts, because that's a big difference in money.  And we

20  cited cases saying that if there's a rescission, money is not

21  wrongfully withheld because prior to that there were claims

22  going both ways between the parties.  But when they elected

23  the remedy of rescission -- and we have cases that say that

24  that's what triggers the right to prejudgment interest,

25  because it's not wrongfully withheld before then, so we do

1   have cases here.  That's really what I would really want to

2   point you to.

3           There's this other sleight of hand argument that we

4   made as far as what the Court ordered as far as going through

5   April, not June, as far as adding in interest --

6           THE COURT:  And we'll come back to that, and that's

7   going to fall in the category I'm afraid for you of be careful

8   what you wish for, but we'll come back to that.

9           MS. DANIEL:  Okay.

10          THE COURT:  Because I will fix that, and I did see

11  what happened there, so we will fix that on the record.  But

12  then let me ask you if you weren't going to address it to

13  address your argument, because we talked about it a little

14  earlier, but this allegation that the jury verdict is

15  inconsistent because of its different findings as to the

16  fraudulent inducement and negligent misrepresentation.  I

17  think you heard Mr. Collard talk a little bit about that, that

18  there wasn't just one misrepresentation, and the jury could

19  have found any number, and how do we know what they did.  I

20  kind of would like your response to that argument.

21          MS. DANIEL:  Well, I think basically the response is

22  that the City's evidence and presentation and arguments was

23  that misrepresentations went all along the way, and I think

24  their expert even did that, and they were relying heavily on

25  this -- you know, this -- the functionality matrix, and I

1    think that their expert was talking in terms of negligence,

2    yet going there into that same area.

3         So as I look at it, you know, the question is if the

4    City -- you know, there were problems going along, and they

5    continued the contract.  You know, there were revisions, and

6    they continued on knowing of the problems.  It really doesn't

7    matter what the scienter was as far as Open International, and

8    that really the question is was the City accepting the

9    contract and continuing on, and so the difference between

10   negligent misrepresentation and intentional misrepresentation

11   seems to not matter.  That's just not -- it doesn't matter.

12   And there's also -- well, I'll just leave it at that.  That's

13   the explanation I can give you.

14        THE COURT:  All right.  Well, let me ask this

15   question, because as I was reviewing the record, and, frankly,

16   when I got that jury question, as the Court listening to the

17   evidence, I agree there were several avenues and statements

18   the jury could have latched on, and in particular for the

19   negligent misrepresentation, it struck me that the

20   representations that continually happened about the go-live

21   dates fall in the category of perhaps negligent

22   misrepresentations, and that would easily explain the jury's

23   verdict, because those would have been discovered the minute

24   it didn't go live on the date promised, and if the jury found

25   those were negligent misrepresentations versus something else,

 1   that would certainly account for their decision on the waiver

 2   issue.

 3          And while it's not our job to rebuild the jury

 4   verdict, it is my job to look at it and see is there a

 5   reasonable explanation for it, and to me, that was an easy

 6   initial source, because at the time the evidence was coming in

 7   that struck me, and I have no basis to conclude the jury did

 8   something different.

 9          MS. DANIEL:  Well, you know, Your Honor, I think that

10   if you look at the jury questions, I think, you know, our take

11   on that is that the jury was confused, and they were -- there

12   were a lot of jury questions which is maybe -- maybe I'm -- I

13   found it unusual, and that they did go to these same issues.

14   So I think that, you know, given that, you know, the scienter

15   -- the scienter really is -- I don't see that it changes the

16   impact of the waiver analysis, and, again, that's my main

17   response to that is I don't think it's -- I don't think it

18   saves it.

19          THE COURT:  All right.  Well, let me just -- to save

20   time, because I don't think I need plaintiff to argue, my

21   finding on that portion of the motion is essentially there

22   wasn't an inconsistent verdict.  There were a variety of

23   issues and statements that were made that were challenged

24   through the case.  I think so far Mr. Collard has listed five,

25   being the matrix, the portal, the schedule, the software

1    itself, and the version, the Version 8.

2         A couple of those, again, easily explain why a jury

3    might find that the statement -- the representation was

4    negligently made.  The City became aware, for instance, when

5    it didn't go live, for instance, when it was confirmed they

6    weren't on Version 8 and had a duty to do something it didn't.

7    But that shouldn't -- in my mind, can't invalidate a jury

8    verdict as to some of the other what the plaintiff

9    characterized as intentional misrepresentations, whether it's

10   the matrix or the portal.

11        And I think Open's own witness didn't help on that

12   much, because I think it was -- I want to say it was

13   Mr. Corredor, but essentially said they spent 30,000 hours,

14   30,000 hours working on issues with the Milestone portal.

15   That -- that alone could justify the entire jury verdict's

16   finding that Open put in the RFP and graded their own portal,

17   yet used Milestone's, didn't disclose that, and then spent

18   30,000 hours of time during this contract on fixing the portal

19   that wasn't even supposed to be used.

20        So in my mind, the evidence even presented from

21   Open's side clearly illuminates the jury's decision, and as a

22   judge you quickly learn juries have a way of sorting through

23   the morass and really getting to the heart of the matter.  And

24   as I review it under the standard I'm required to, there's

25   simply no way I could conclude this was an inconsistent

1  verdict.  There's absolutely a reasonable explanation for that

2  decision.

3      And I don't find the cross-out on the verdict form to

4  be relevant either.  Juries frequently cross out things on

5  verdict forms.  You'd be surprised by that.  And that to me is

6  not indicative of anything.  We polled the jury.  They

7  confirmed it was their verdict.  They heard it.  And if there

8  was any hesitation whatsoever, that could have been remedied.

9      And I think this will come up on another issue, but

10  the number of jury questions, I'm one of the few judges that

11  allow juries to ask questions.  I think in our last jury, what

12  did we have, Julie, 45, 48 questions, so the number in this

13  case dims in comparison, and that was in just a regular old

14  insurance contract.  So I don't take the jury's questions to

15  be anything other than normal listening and attentive jurors

16  taking advantage of perhaps an overly optimistic judge's

17  willingness to let them ask questions, so that too is not a

18  reason.

19      So with that, let me just confirm there's no other

20  separate issue you want to argue in ECF 353.

21      MS. DANIEL:  No, Your Honor.  I think the other

22  issues that are in the briefing --

23      THE COURT:  Okay.

24      MS. DANIEL:  -- we ask you to consider, but I don't

25  think that we need to take them up today.

Sarah K. Mitchell, RPR, CRR

1        THE COURT:  All right.  And so then let me turn to

2   the plaintiff's side.  Do you specifically want to supplement

3   what's in the briefing about any of the issues raised?

4        MR. COLLARD:  Can I have one moment, Your Honor?

5        THE COURT:  Sure.

6        MR. COLLARD:  Okay.  Is there anything you want,

7   first of all?  Maybe I'll ask that.

8        THE COURT:  Well, I'm going to hold off on this

9   prejudgment interest issue and the labor costs because we're

10  going to come back to that at the end, so I may be talking to

11  you at the end about that.  I think I understand what

12  happened, and it was a complete error on our part.  But we

13  will fix that.  So I may want to hear from you on that, but

14  otherwise, I read this as Open properly preserving issues on

15  appeal and inviting me to take a second look.

16       MR. COLLARD:  One moment.  Your Honor, a number --

17  one quick case that we want to put in the record that we think

18  -- I mentioned the issue preclusion argument before.  I think

19  a lot -- not a lot -- I think some of these issues have the

20  same -- in the Rule 59 motion have the same issue where the

21  jury's finding would preclude a contrary finding from you.

22  I'll use laches as an example is another one.  So I want to

23  give you *Marquardt v. Perry*, 200 P.3d 1126.  It's a Colorado

24  appellate case, 2008, that covers that, but other than that,

25  we'll wait for you on PJI and whatever else you want us to

1   cover.

2        THE COURT:  I should ask you is there anything you

3   want to add about the inconsistent verdict, because it struck

4   me that a lot of time was spent in the briefing on that, and

5   if there's anything you want to add, I spent some time on it,

6   as did Ms. Daniel.  So if there's anything you want to add on

7   that.

8        MR. COLLARD:  Looking at my notes very quickly.  I

9   think, Your Honor, I guess what I would say is, as you pointed

10  out, the scienter issue is not the only question or the only

11  difference since different conduct can map to each claim, and

12  then I would probably have -- if I could go back, cite your

13  *Curtis Park* decision which I think lays out the framework for

14  this analysis in great detail on how to do this analysis.

15        And then I think the final point that they made, that

16  this was not -- they made a claim this was a special verdict,

17  and in our view I don't think it was a special verdict,

18  because the ultimate legal result was fraud, and then there

19  was an equitable phase on restitution.  I'll leave it there.

20        THE COURT:  All right.  Okay.  So let's -- let's go

21  through this.  I would add both parties set forth the

22  applicable standards for Rule 50(b), 52(b), 59(a), 59(e), and

23  essentially while I would say Rule 50 has its own special

24  higher burden in that, as I mentioned, I need to find proof

25  that is overwhelmingly in favor of the party who did not

1    prevail to set aside any jury findings, and for the reasons

2    I've discussed, I just cannot find that based on the record.

3           The other three kind of combined motions really

4    target if there's an error in law or fact, and for the reasons

5    that I'll briefly put on the record, I find there is not, and

6    I'm denying ECF 347 almost in entirety, but we'll talk about

7    that error in a moment.  So as I go through it, we've

8    discussed the inconsistent verdict.  I don't have anything

9    else to add for the record there.  I just would sum up by

10   saying there's a very clear path to how the jury got to the

11   result it did, and I do not feel there's overwhelming proof or

12   evidence such that I could overturn that in any way, shape, or

13   form.

14          We now come to waiver, the waiver of the rescission

15   remedy versus waiver of the claim.  For reasons I've

16   discussed, the test is largely the same.  There could be some

17   semantics in different cases that find there's a slightly

18   different way of wording it.  I would note under any standard

19   as to rescission I would not find that -- and I do not find

20   that the City waived the rescission remedy, and I should

21   preface that by saying and reiterating that the matter of

22   election of remedies and when that was to happen was in my

23   discretion.

24          Based on discussions with the parties and review of

25   the record, it was clear to me that all of the evidence was

1    going to be presented, and there was no way to separate it

2    out, and thus there was no need to force an election, a

3    premature election, and that is why I made the decision I

4    made, and that is already on the record anyway.  But once we

5    got there and now we have the jury verdict and looking at the

6    question of is the remedy waived, I find it was not.

7         Again, I go back to the testimony about the

8    functional review in the spring of 2021, and that is where

9    really the City had its first eye-opening look at what was --

10   had gone on and what was likely to continue.  The

11   conversations between the two -- the two parties after that

12   solidified that in that really the option was to incur an

13   expense of $3 million to continue with Open with zero

14   guarantees of it working then, and that was something the City

15   chose not to do when faced with that option, so there's

16   nothing about that that I find the City lied in wait and tried

17   to get the benefit of a deal and did not elect timely.

18        I think what was happening was the City was working

19   in good faith to try and make this product work because it had

20   already invested a substantial sum into it, and abandoning it

21   without proper reason would not have been advisable.  But once

22   it was learned as to the complete and utter deficiency of the

23   product through the functional review, it did elect to

24   terminate the contract and pursuant to my order could elect

25   the remedy of rescission upon the finding of liability.

1           I should note with respect to -- I think in support

2    of the notion that some of these problems were not known to

3    the City until the functional review, I found Dwayne Bishop's

4    testimony to be extremely damaging to Open.  He was running --

5    the head of the Milestone portal, and some of the e-mails

6    discussed and produced in evidence with him and Open

7    employees, frankly, were surprising in the sense that it

8    appeared Open was being told repeatedly of issues, was not

9    advising the City of issues, was hiding those issues such that

10   Mr. Bishop I think called this the worst project he had ever

11   worked on or something, and expressed dismay about how the

12   City was being treated.

13          So when you have your own agent making statements

14   like that, it doesn't bode well, and I think that is supported

15   by the notion that the functional review was the first time

16   the City had a clear and complete look that they had been

17   defrauded and the statements made to induce them into the

18   contract were not true, and that is I believe why the jury

19   found the way they did.

20          Let's see the next issue.  So in that regard, I

21   certainly am denying the new trial on the waiver issue.  With

22   respect to the handling of jury questions, I know we have a

23   disagreement about what the jury was confused about.  I am

24   comfortable with the instruction they received, and I see no

25   error there, so I deny a new trial on that basis.

1          In terms of amending the judgment pursuant to 52(b)

2    and 59(e), the Open Investments issue we've talked about

3    repeatedly.  It is denied in this motion as well.  Laches is

4    an issue for the Court.  I made that finding at trial.  I see

5    no basis to disturb it.  There is no showing -- there was no

6    showing of unconscionable delay in enforcing rights in this

7    case.  It did not even come close which is why I granted the

8    Rule 50 on that for the City and do not disturb that through

9    this ruling.

10          All right.  Let's talk about the labor costs.  I'll

11   deny the motion as to reimbursement of out-of-pocket costs.

12   We detailed the authority we were relying on.  I'm still

13   relying on *Trimble*.  I think there's a disagreement, and the

14   Tenth Circuit is the perfect party to hear that disagreement.

15   But with respect to the labor costs, let me say, I went back

16   because I was perplexed as to how we got there, and I'm not

17   quite sure we're all on the same page.

18          It is not fair, and it was somewhat misleading for

19   Open, frankly, to imply that I made a ruling that five-month

20   period was not included.  I clearly made no such ruling.  In

21   fact, what I did is I granted the labor costs.  What appears

22   to have happened is we pulled the wrong number from the

23   briefing and inserted it.  So by no way, shape, or form was I

24   intending to limit or cut off those five months from the labor

25   costs.

1              So I believe what -- and Mr. Collard, this is where

2     I'm counting on you -- I think what's happened is in the

3     original judgment we used the wrong number of 4.4 something,

4     but in the amended judgment we actually used the correct

5     numbers assuming we'd use the correct numbers in the

6     beginning, meaning the amended judgment is correct.

7              MR. COLLARD:  Your Honor, that is my understanding

8     from when we looked at it -- we looked at it while we were

9     briefing it, and the way I would say is there was a typo that

10    -- it's trying to get turned into a substantive thing.  But I

11    think the number is correct.  I think that the date range is

12    all that needs to be corrected.

13             THE COURT:  All right.  So -- and I'll let Open

14    comment on this, but -- and it's not even fair to say it was a

15    typo.  We made an error, and so it's an error, and under

16    Rule 60 sua sponte I'm going to fix it, so I'm going to do a

17    nunc pro tunc amendment to the original judgment to get in the

18    correct number for the labor costs, which then asked for the

19    interest to be calculated.  I think that fixes it unless

20    you're telling me somewhere there's an error about where we

21    put the wrong date, but I thought the amended judgment was

22    actually correct.

23             MR. COLLARD:  You may be right, Your Honor, and when

24    I say the wrong date, I say the number was based on a

25    different date range, but I would have to -- rather than it

1   actually listing the incorrect date.  I'm going to stop.  I

2   agree with you, Your Honor.

3         THE COURT:  Well, that's an easy answer.  Let me get

4   an opinion from Open knowing that you certainly didn't intend

5   to open a Pandora's box, but you did, but I think it's better

6   that we all go forward on appeal with the correct amounts, and

7   clearly we inserted the wrong number in the original judgment

8   is my feeling about it.

9         MS. DANIEL:  Yeah, so, Your Honor, I have nothing

10  further to say.  The Court says it was an error as far as

11  those numbers.  I will make clear, though, I'm not waiving the

12  argument that the start date should have been the date of

13  rescission.

14        THE COURT:  Certainly, yes.  I understand that.  So

15  that's what we're going to do, and I'll work on getting that

16  out.  It will just be a text order correcting the first

17  judgment, and, again, I do not believe the amended judgment

18  needs to be corrected because by then we assumed the correct

19  underlying number in awarding prejudgment interest.  And,

20  Mr. Collard, I'll -- you don't have to scramble right this

21  minute.  What I'd say is we'll hold off until tomorrow.  If

22  you think that's not accurate, what I want you to do is

23  consult and then send a joint e-mail, but I think in my review

24  that is what happened.

25        MR. COLLARD:  Your Honor, I'm -- we'll do that.  I'm

Sarah K. Mitchell, RPR, CRR

1    pulling it up right now.  I think I'm seeing this on page 23

2    of your March 21st order is I think the number that needs to

3    be updated, but we'll do what you said.

4            THE COURT:  Let me see if I even brought that out.

5            MR. COLLARD:  Maybe we should clarify right now while

6    we're here.

7            THE COURT:  The March 21st order?

8            MR. COLLARD:  Well, there's two, because there's

9    Docket 327 and 328, so maybe we should clarify the docket

10   number.

11           THE COURT:  I would say 328.

12           MR. COLLARD:  Okay.

13           THE COURT:  And then as we look -- no, 328 is denial

14   of the -- oh, yeah, you're right.

15           MR. COLLARD:  It has on it on page 23, the very last

16   page.  I think it's that number in 2C.

17           THE COURT:  So, yeah, the number in C should not have

18   been that.  The issue is -- and I don't want to bore you with

19   the details -- but the 4.3 was laid out separately, and then

20   there was a request for a prejudgment interest.  The 850 was

21   worded in such a way that it said here's what we incurred with

22   interest, so I think having no way to distinguish we assumed

23   that was in the 4.3, and it wasn't.  But as we look at it, I

24   don't even -- I'll have to go back and pull that.  But -- and

25   it could be that both parties feel because the amended

                    Sarah K. Mitchell, RPR, CRR

1    judgment has the correct numbers, we don't need to do

2    anything.

3              MR. COLLARD:  Your Honor, I'm happy to confer with

4    them.  I think we've identified exactly where you want us to

5    focus, and so we'll make a proposal to them this afternoon or

6    this evening or tomorrow morning or as soon as we can, and

7    we'll e-mail you.

8              THE COURT:  That sounds fine, and if it's not until

9    Monday, that's fine too, because the conferral could take

10   time.  But that is exactly what happened is we simply pulled

11   the number for the first portion, didn't include those five

12   months believing it had been combined for some reason.  It

13   clearly wasn't.  But by the amended judgment we were using the

14   expert's numbers, and he had I think used the correct numbers,

15   and so the resulting 7 million with interest is correct.  So

16   if you can confirm that or go through some exercise to

17   demonstrate what else happened, that would be helpful.

18             With that, is there anything else we need to address?

19   So let me make clear, I'm granting -- well, I think it's

20   easier to deny the motion that we just went through at 353,

21   and then what I'm doing is under Rule 60 is I'll just do a

22   text order fixing the original judgment amount, but by the

23   time the interest is added, the interest is using the correct

24   amount, so the amended judgment does not need to be changed.

25   Anything else from either party?

                    Sarah K. Mitchell, RPR, CRR

1          MR. COLLARD:  Your Honor, do you want to put

2   something specific on the record on the date of prejudgment

3   interest that I think was disputed?

4          THE COURT:  Thank you.  That's fair.  For the reasons

5   that I already went through, I did find the cases relied on by

6   the City more compelling, and so that is the reason that we

7   used that date.  So I'm denying the motion based on the -- on

8   Open's cites.  I think in this case, given what occurred here,

9   the money was wrongfully withheld from the start given the

10  fraud, and it was appropriate to use that original date in

11  calculating the prejudgment interest, so that is why we did

12  that.  So the motion is denied on that as part of the overall

13  denial.  With that, we will be in recess.

14          MR. COLLARD:  Are you going to issue a written order

15  or is this it?

16          THE COURT:  This is it.  It seemed to be the best way

17  to work through it and to let the parties supplement anything

18  they wanted to supplement.  I think since you've -- the appeal

19  is waiting for you, it was the easiest way to get you on your

20  way.  So we'll see what the Tenth Circuit does.  We'll be in

21  recess.

22          THE COURTROOM DEPUTY:  All rise.  Court will be in

23  recess.

24      (The proceedings were concluded at 2:31 p.m.)

25

Sarah K. Mitchell, RPR, CRR